[No. 49868–7.   En Banc.   November 6, 1984.]

CHEMICAL BANK, *Appellant,* v. WASHINGTON PUBLIC POWER SUPPLY SYSTEM, *Appellant,* PUBLIC UTILITY DISTRICT NO. 1, ET AL, *Respondents.*

*Betts, Patterson & Mines, P.S.,* by *Michael Mines* (*Robert F. Mullen, Ralph L. McAfee, Richard S. Simmons,* and *Cravath, Swaine & Moore,* of counsel), for appellant Chemical Bank.

*Culp, Dwyer, Guterson & Grader,* by *Richard C. Yarmuth, Michele Coad, Robert O. Marritz,* and *Earle J. Hereford, Jr.,* for appellant Washington Public Power Supply System.

*Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern,* by *Albert R. Malanca, Kenneth G. Kieffer,* and *Donald S. Cohen,* for respondent Washington Public Utilities Group.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *Richard S. White, David F. Jurca,* and *Linda J. Cochran,* for respondents Columbia Rural Electric Association, Inc., et al.

*Stimson Bullitt, John D. Lowery,* and *Thomas W. Burt* (of *Riddell, Williams, Bullitt & Walkinshaw*), for 21 respondents.

*Jones, Grey & Bayley, P.S.,* by *Hugo E. Oswald, Jr., Margaret A. Pageler, Richard L. Goldfarb,* and *James A. Miller; George F. Hanigan;* and *James P. McNally* and *McNally & Stewart,* for respondents City of Ellensburg, et al.

*Lane, Powell, Moss & Miller,* by *John R. Tomlinson, H. Peter Sorg, Jr.,* and *Timothy F. Brown,* for respondents Oregon PUD's.

*Hillis, Phillips, Cairncross, Clark & Martin, P.S.,* and *Jerome L. Hillis, Michael F. Schumacher,* and *Gregory E. Keller,* for 9 respondents.

*Dwight A. Halstead* and *Halstead & Ingvalson,* for respondent Benton Rural Electric Association.

*Brown, Thayer & Drummond,* by *Robert M. Brown,* for respondent Inland Power and Light Co.

*Thoreson, Berry, Yost & Matthews* and *Ernest C. Matthews IV* (*Robert H. Jaffe* and *Jaffe & Schlesinger,* of counsel), for intervenors.

*John R. Allison, Sharon S. Armstrong,* and *Alan P. Sherbrooke* on behalf of the City of Seattle, amici curiae.

*Michael D. McKay* and *Charles Webb III* on behalf of National WPPSS 4 and 5 Bondholders Committee, amici curiae.

ROSELLINI, J.—This case first came before our court in *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983) (*Chemical Bank* I) for resolution of the issue of whether 28 municipalities and public utility districts (PUD's) had statutory authority to enter into agreements to build Washington nuclear plants (WNP) 4 and 5. We held that no statutory authority, express or implied, existed and remanded the case for action in accordance with the opinion.

The trial court entered summary judgment in favor of all 88 participants (respondents) in WNP 4 and WNP 5. On appeal, appellants Washington Public Power Supply System (WPPSS) and the bondholders' trustee, Chemical Bank, raise multiple challenges to the trial judge's order of summary judgment.

Appellants also seek review of our decision in *Chemical Bank* I under the terms of Rule of Appellate Procedure 2.5(c)(2).

This factual and legal background, discussed in *Chemical Bank* I, is exceedingly complex. The primary legal issues

discussed at length in this opinion can be summarized as follows:

## PROCEDURAL QUESTIONS

1. Should this court reconsider its decision in *Chemical Bank* I?

2. Did the trial judge's order granting summary judgment in favor of all defendants exceed the proper scope of the declaratory judgment action initiated by Chemical Bank?

3. Are any bondholders entitled to intervene in this action at this stage in the proceeding?

## CONTRACTUAL OBLIGATION

4. Do the Washington municipalities and PUD's have statutory authority, either express or implied, to enter into contracts which impose the risk of dry holes on their rate-payers?

5. If the Washington municipalities and PUD's did not initially have statutory authority to enter into these contracts, did the Legislature subsequently ratify the agreements?

6. Did the trial judge err in holding that, because the contracts were unenforceable as to the Washington municipalities and PUD's, they were also unenforceable as to the remaining defendants under any of these three theories: (a) indivisibility of contract? (b) mutual mistake? (c) commercial frustration and impracticability?

## AVAILABILITY OF EQUITABLE REMEDIES

7. If the participants are not contractually obligated to the bondholders, are they nonetheless estopped from denying the obligation under either common law notions of estoppel or article 8 of the Uniform Commercial Code?

8. If the contracts are invalid, are the bondholders nonetheless entitled to restitution from the participants?

## CONSTITUTIONAL CLAIMS

9. Did the release of the participants' contractual obligation violate the bondholders' constitutional rights?

Our resolution of this case is as follows:

# I
## PROCEDURAL PRELIMINARIES

For the reasons discussed below, we believe reconsideration of our decision in *Chemical Bank* I is appropriate. We find the summary judgment order did not exceed the scope of the declaratory judgment action and conclude the bondholders' motion to intervene should be denied.

# II
## CONTRACTUAL OBLIGATIONS

We herein affirm our decision in *Chemical Bank* I and reject appellants' arguments that the Legislature ratified the ultra vires contracts. We also affirm the trial judge's release of the 60 remaining participants' obligation on the grounds of commercial frustration and mutual mistake.

# III
## EQUITABLE OBLIGATIONS

Our review of the historical origins of equitable estoppel convinces us that the doctrine should not be applied to the facts of this case. We find that the statutory equivalent of equitable estoppel under the Uniform Commercial Code, RCW 62A.8–202, is inapplicable.

# IV
## CONSTITUTIONAL CLAIMS

We find no violation of appellants' state or federal constitutional rights.

## STATEMENT OF THE CASE

Procedurally, this case comes before the court following the trial judge's decision to grant summary judgment in favor of all defendants/participants in WNP 4 and WNP 5. *Chemical Bank* I contains an extensive factual recitation. In addition, the following information pertains to the present action.

WPPSS is a joint operating agency and municipal corporation composed of 19 Washington public utility districts and four cities. It was formed in 1957 under the provisions of RCW 43.52.360. That statute allows cities or public util-

ity districts and combinations thereof to form an operating agency "for the purpose of acquiring, constructing, operating and owning plants, systems and other facilities . . . for the generation, and/or transmission of electric energy and power." The statute further provides that after such an agency is formed, any other city or PUD may become a member upon application and affirmative vote of a majority of its members. A member may withdraw provided "[t]hat all contractual obligations incurred while a member shall remain in full force and effect." The agency may be dissolved upon the unanimous agreement of its members and "the members, after making provisions for the payment of all debts and obligations, shall thereupon hold the assets thereof as tenants in common."

In the early 1970's, WPPSS started construction of three nuclear power plants, WNP 1, WNP 2, and WNP 3. The projects were developed in conjunction with the Bonneville Power Administration. Although those plants also ran into financial trouble, it is the fate of two subsequent plants, WNP 4 and WNP 5, which concerns us here. Plans for these plants were developed when the 88 participants, respondents, joined with WPPSS and Pacific Power and Light Company (WNP 5 only) to obtain financing.[1] Each participant signed an identical 63–page participants' agreement (PA) dated July 14, 1976.

WPPSS then adopted a bond resolution which provided for the construction of both plants and the issuance of revenue bonds. As many of the parties' claims stem from interpretation of the PA, a detailed analysis of this document is necessary.[2]

As noted in *Chemical Bank* I, the PA provided that each participant purchase a "share of the Project Capability"

---

[1]Respondents include 9 Washington cities; 7 Oregon cities; 5 Idaho cities; 19 Washington PUD's; 1 Washington irrigation district; 43 rural electric cooperatives; and 4 Oregon PUD's.

[2]All page references are to the bound volume submitted as appendix to the record on appeal.

and "a right to purchase a share of the capability of any other generating plants undertaken by [the] Supply System . . ." PA, at 2. Project capability was defined as

the amounts of electric power and energy, if any, which the Projects are capable of generating at any particular time (including times when either or both of the Plants are not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or curtailed, in each case in whole or in part for any reason whatsoever), less Project station use and losses.

In addition, the participants' agreement gave each participant certain rights, both individually and through representatives on a participants' committee. As appellants claim the participants' committee granted significant control to the participants, a detailed analysis of its function is appropriate.

The committee was to be composed of not less than two nor more than seven members and participants were entitled to designate which representative would vote their shares. PA § 15(a). The participants' committee was required to meet at least quarterly during the construction of the projects. PA § 15(b). Committee meetings could be called anytime, however, if representatives with 20 percent of the participant shares so requested. Casting individual votes for each participant's share they represented, committee members were *required* to vote the shares in the manner requested by the participants they represented. PA § 15(b), at 40.

The participants' agreement also detailed procedures for the transfer of information from WPPSS to the committee members and interested participants. The participants' agreement stated that WPPSS was to provide the committee and any participants who so requested with the following information:

Determination of Minimum Capability.

Construction budgets and changes therein (Section 8(a)).

Award of any contract or approval of any change order, in either case in excess of $2,000,000, or such other con-

tracts as determined by the Participants' Committee.

Budgets of annual costs and revisions thereof (Section 8(b)).

Fuel Plan, changes therein, and determinations relating thereto (Section 9).

Operating schedules (Section 10).

Insurance coverage, including limits and choice of insurers (Section 11).

Estimates of costs of repair of damage to a Project if in excess of $5,000,000, recommendation whether to repair in whole or in part or to remove from service and construction budget for repair of Project.

Sales of salvage materials in excess of such minimum amount as is established by the Participants' Committee.

Change of an architect–engineer.

Proposed Bond Resolutions.

Any proposal made by Participants' Committee members representing Participants' Shares voting rights of 20% or more.

Construction or acquisition of Nuclear Project No. 5 pursuant to Section 22(b) of the Ownership Agreement.

Repair of Nuclear Project No. 5 pursuant to Section 16(b) of the Ownership Agreement.

Increase in the Supply System's ownership interest in Nuclear Project No. 5 pursuant to Section 20 of the Ownership Agreement.

PA § 15(c), at 41–42.

Members of the participants' committee, representing 20 percent or more of the shares, could disapprove of any action by WPPSS in the above areas and could force the matter to be reviewed by a project consultant.[3] Using this power, the record indicates that the participants' committee disapproved the 1983 annual budget and disapproved of a contract settlement because the allocation of damages between WNP 3 and WNP 5 was "inequitable."

Finally, the participants were granted certain rights in the completed plants. They were given a share of project capability, and the right to have the plants' output adjusted to meet their needs. PA § 9. If the projects were termina-

---

[3] If a matter went before a project consultant, his task was to determine whether WPPSS's actions conformed with prudent utility practice. PA § 16.

ted, the projects' assets were credited to the participants' accounts. PA § 13. Pursuant to this agreement, WPPSS issued $2.25 billion worth of bonds in 14 series. When the projects ran into massive cost overruns, WPPSS decided to terminate the plants prior to completion. Many of the participants then repudiated their obligations.

Chemical Bank, the trustee for the bondholders, filed a declaratory judgment action in King County Superior Court in May 1982, seeking a legal determination that the participants were contractually bound to make payments to WPPSS pursuant to the participants' agreement payment schedule.

In late 1982, the trial judge granted Chemical Bank's motion for summary judgment. He held that the participants were required to fund their respective shares of the debt service on the bonds, even if the projects were never completed. He also ruled that the participants were required to fund the costs of decommissioning the terminated projects. He further found that the Supply System and the Washington participants had statutory authority to enter into the participants' agreements. The trial judge concluded that the municipal participants' obligations were not violative of Washington's constitutional limit on incurring debt, and were not an unlawful delegation of power or authority. This court granted discretionary review and rejected the trial judge's conclusion that the Washington municipalities had authority to enter into these contracts.

The case was returned to the trial court for action in accordance with the opinion. Several defendants moved for summary judgment based on this court's mandate. The judge ordered summary judgment in favor of all the defendants. The order provided, in part:

1. In compliance with the mandate of the Washington Supreme Court, the defendants which are Washington public utility districts or Washington municipalities lacked authority to enter into said Agreement and as to them the Agreement is *ultra vires,* void *ab initio,* invalid, ineffective and unenforceable;

2. Inasmuch as the Participants' Agreement is *ultra vires*, void *ab initio*, invalid, ineffective and unenforceable as to the defendants which are Washington public utility districts or Washington municipalities, and by reason thereof, the Participants' Agreement is also ineffective and unenforceable as to all other moving defendants and all participant defendants, on the grounds of (a) contract indivisibility and failure of the condition of substantially 100% participation, (b) mutual mistake as to the authority of Washington public utility districts and municipalities to enter into the Agreement, and (c) frustration of purpose and impracticability.

Order and Judgment, August 11, 1983, at 2–3.

The court then rejected all objections and contentions raised in opposition to this motion by Chemical Bank and WPPSS, concluding that

none of the moving defendants or any other participant defendant is obligated . . . to make any payment to WPPSS, or to any other defendant, or to Chemical or any purchaser or holder of bonds issued by WPPSS . . .

Order and Judgment, August 11, 1983, at 3.

This court granted review to resolve the issues set out above.

I

PROCEDURAL PRELIMINARIES

A. *Reconsideration of Chemical Bank I*

The issue of statutory authority was addressed in *Chemical Bank* I. Nonetheless, appellants seek review of that decision under the provisions of RAP 2.5(c)(2).

Appellants urge that reconsideration is appropriate because of the importance of the issues raised by the case, and because reconsideration is authorized by the Rules of Appellate Procedure.

RAP 2.5(c)(2) states:

(2) *Prior Appellate Court Decision.* The appellate court may at the instance of a party review the propriety of an earlier decision of the appellate court in the same case and, where justice would best be served, decide the case on the basis of the appellate court's opinion of the law at the time of the later review.

A comment to this rule notes that application of this section is mandatory when justice would be best served by a reexamination of the law at the time of the later review. The comment states prior law, referring to the predecessor rule as discretionary, is superseded.

■ We conclude the complexity of the statutory authority issue and the importance of this litigation to thousands of individuals require a balance between principles of finality embodied in the Rules of Appellate Procedure and the interests of those involved. Moreover, we note consideration of issues raised for the first time in this second appeal by necessity involve discussion of the issues decided in *Chemical Bank* I. We will therefore first reevaluate our decision in *Chemical Bank* I and then turn to those issues new to this appeal. Before doing so, however, two other procedural matters must be addressed.

### B. *Intervention*

The final issue arises from a motion by six bondholders to intervene in this action. Intervenors base their motion on the provisions of CR 24 and RCW 7.24.010.

By court rule, intervention should be permitted, *upon timely application,*

> (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

CR 24(a), in pertinent part.

RCW 7.24.110 states the specific rule governing declaratory judgments. It provides:

> When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.

In *Williams v. Poulsbo Rural Tel. Ass'n,* 87 Wn.2d 636, 555 P.2d 1173 (1976), this statute was characterized as jurisdictional. The court held that failure to include an affected party, *i.e.,* an essential party, required remand of the case. *Williams,* at 643. This is the relief sought by bondholders.

The motion requests "that this Court remand this action back to the trial court for further proceedings to give an opportunity for all holders and former holders of the Bonds to join this action as party plaintiffs." The proposed intervenors suggest that in such further proceedings they will be in a position to litigate claims which Chemical Bank has made, but for various reasons may be precluded from pursuing, either in state court or in federal court, or both. The complaint in intervention would also add claims not previously made in this litigation, and would bring in new defendants. The complaint states, for example, negligence and malpractice claims against engineers and attorneys.

Relying on *Martin v. Pickering,* 85 Wn.2d 241, 533 P.2d 380 (1975), the various responses to the motion note that it is not timely.

We note, however, the declaratory judgment statute does not have a timely exception. Also, in *Williams,* this court's characterization of the failure to join interested parties in a declaratory judgment action as a jurisdictional defect suggests no timely element is necessary. On the other hand, CR 24 clearly requires timely application, even when a statute confers an unconditional right to intervene. This leaves an apparent conflict between the way the statute has been interpreted and the court rule.

When statutory provisions and rules of court adopted by the Supreme Court conflict, the court rule governs. *Emwright v. King Cy.,* 96 Wn.2d 538, 543, 637 P.2d 656 (1981). Here, however, the conflict is not so much between the statute and the court rule as it is between our interpretation of the statute and our court rule. We believe this conflict must be resolved in favor of requiring timely application, even when intervention is a matter of right

granted by statute.

First, efficient management of litigation can be achieved only by timely application.[4] Here, for instance, the bond-holders' motion to intervene would require reevaluation of matters already argued by the parties and determined by the trial court. This would in turn require duplication of work by attorneys and the judicial system at a staggering cost to all.

Second, principles of finality weigh in favor of requiring timely application. Where, as here, thousands of potential intervenors/plaintiffs exist, the defendants to the action cannot be expected to defend each action brought by bond-holders dissatisfied with the initial result.

Our conclusion that timely application is required dis-poses of the bondholders' motion, which was not filed until this action reached the late stages of the appellate process.

We turn now to the subsidiary question of whether the bondholders are bound by the results of this litigation. The trial judge's order released all claims, including the bond-holders', raised against the participants. The declaratory judgment statute, however, states that an interested party who is not joined cannot be prejudiced by the results of the declaration. Since the bondholders are certainly parties who have an interest in the litigation, we must decide whether this section of the statute will be interpreted literally. If so, that portion of the order pertaining to the bondholders must be struck.

We believe that this result would be improper, where, as here, the interested parties have a *designated representative*. The bond resolution stated that the bond trustee, *i.e.*, Chemical Bank, was to represent all bond-holders.[5] Chemical Bank has served in this capacity for the

---

[4]To the extent that the language in *Williams v. Poulsbo Rural Tel. Ass'n, supra,* suggests the opposite result, it is overruled.

[5]The bond resolution provided, *inter alia*:
"Section 11.4. Suits by Bond Fund Trustee; Direction of Action by Bondhold-ers; Possession of Projects; Receivership; Relinquishment of Control. If an Event

entire history of this action, and vigorously pressed the bondholders' claims. Under these circumstances, the bondholders must abide by the results obtained by their designated representative. Finally, the claims intervenors raise pertain to the securities' action that is now being tried in federal court. For relief on those claims, the intervenors should seek relief in that forum. As to the contract actions, we hold that the designated representative has fulfilled the representative function contemplated by the intervenor statutes. The motion to intervene is therefore denied.

---

of Default shall happen and shall not have been waived or remedied, then and in every such case the Bond Fund Trustee, either in its own name or as trustee of an express trust, or as attorney in fact for the holders of all the Bonds and the coupons appurtenant thereto, or in any one or more of such capacities, by its agents and attorneys, shall be entitled and empowered to proceed forthwith to institute such suits, actions and proceedings at law or in equity for the collection of all sums due in connection with the Bonds and to protect and enforce its rights and the rights of the holders of the Bonds under the Resolution for the specific performance of any covenant herein contained, or in aid of the execution of any power herein granted, or for an accounting against the System as trustee of an express trust, or in the enforcement of any other legal or equitable right as the Bond Fund Trustee, being advised by counsel, shall deem most effectual to enforce any of its rights or the rights of the holders of the Bonds, or to perform any of its duties under the Resolution. The Bond Fund Trustee shall be entitled and empowered, either in its own name or as a trustee of an express trust, or as an attorney in fact for the holders of the Bonds and the coupons appurtenant thereto, or in any one or more of such capacities, to file such proof of debt, amendment of proof of debt, claim, petition or other document as may be necessary or advisable in order to have the claims of the Bond Fund Trustee and of the holders of the Bonds and of the coupons appurtenant thereto allowed in any equity, receivership, insolvency, bankruptcy, liquidation, readjustment, reorganization or other similar proceedings relative to the System. For this purpose the Bond Fund Trustee is hereby irrevocably appointed the true and lawful attorney in fact of the respective holders of the Bonds and of the coupons appurtenant thereto (and the successive holders of the Bonds and of the coupons appurtenant thereto by taking and holding the same shall be conclusively deemed to have so appointed the Bond Fund Trustee) with authority to make and file in the respective names of the holders of the Bonds and of the coupons appurtenant thereto any such proof of debt, amendment of proof of debt, claim, petition or other document in any such proceedings, and to receive payment of any sums becoming distributable on account thereof, and to execute any such other papers and documents . . ."

## C. *Scope of Judgment*

Appellants contend the summary judgment order entered by the court in this case exceeded the scope of their declaratory judgment action. Chemical Bank's complaint sought

a determination that the Supply System was obligated to make payments to the bond holders and that the Participants were obligated to make payments to the Supply System under the terms of the Participants' Agreement.

Oral Decision, August 17, 1983.

Chemical Bank now asserts that its original pleadings sought only a judicial determination of the relationship between the parties, rather than an affirmative claim of relief. This argument is without merit. First, this theory ignores Chemical Bank's own expansion of the scope of the first action. In that action, Chemical Bank moved for summary judgment on a variety of issues. When summary judgment was granted in its favor on these issues, Chemical Bank did not allege that the order exceeded the proper scope of the pleadings.

Moreover, by expanding proceedings with its original summary judgment motion, Chemical Bank invited a determination of the parties' entire legal obligations. Chemical Bank cannot now complain that the determination against it was improper.

## II
### Contractual Obligations
#### A. *Statutory Authority*

As noted above, appellants' first substantive challenge is to this court's prior conclusion that the Washington municipalities and PUD's did not have statutory authority to enter into these agreements. Before addressing their specific arguments, a brief statutory review is in order.

This statutory authority issue involves 28 participants: 19 PUD's and 9 Washington cities of various classes. One category of relevant statutes grants these 28 participants authority to purchase electricity. PUD's are granted with authority under the terms of RCW 54.16.040, which pro-

vides:

> A district may purchase, within or without its limits, electric current for sale and distribution within or without its limits, and construct, condemn and purchase, purchase, acquire, add to, maintain, conduct, and operate works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam, or other methods, within or without its limits, for the purpose of furnishing the district, and the inhabitants thereof and any other persons, including public and private corporations, within or without its limits, with electric current for all uses, with full and exclusive authority to sell and regulate and control the use, distribution, rates, service, charges, and price thereof, free from the jurisdiction and control of the utilities and transportation commission, in all things, together with the right to purchase, handle, sell, or lease motors, lamps, transformers and all other kinds of equipment and accessories necessary and convenient for the use, distribution, and sale thereof: . . .

Each class of municipal participant has similar grants of authority to purchase electricity. *See, e.g.,* RCW 35.23-.440(43); RCW 35.24.290(3); RCW 35.27.370(4); RCW 35A-.80.010.

The statutory provisions creating WPPSS grant an additional layer of statutory authority to purchase electricity. Those statutes allow creation of a joint operating agency which "shall have authority" (1) to generate, produce, transmit, deliver, exchange, purchase or sell electric energy and to enter into contracts for any or all such purposes (RCW 43.52.300(1)); (2) to construct, condemn, purchase, lease, acquire, operate, develop and regulate facilities for the generation of electric energy (RCW 43.52.300(2)); (3) to enter into contracts for sale, exchange, transmission or use of electric energy (RCW 43.52.300(3), (4)); and (4) to act as agent for the purchase and sale at wholesale of electricity for any city or district whenever requested to so do (RCW 43.52.300(7)). These statutes are to be liberally construed to effectuate their purposes. RCW 43.52.910.

A second category of statutes grants cities and PUD's

authority to enter into joint operating agencies for the purpose of developing nuclear power. RCW 54.44. RCW 54.44-.020 states that the utility or city "shall own a percentage of any common facility equal to the percentage of the money furnished or the value of property supplied by it for the acquisition and construction thereof and shall own and control a like percentage of the electrical output thereof." RCW 54.44.030 limits a participant's liability to its own acts and forbids the participant from assuming any of the other participants' debt or obligation.

Cities and PUD's may also construct energy facilities on their own. RCW 35.92.050 authorizes a city or town to construct, condemn, purchase and acquire facilities for the purpose of furnishing the city or town or its inhabitants with electricity. PUD's have similar authority to construct generating facilities under RCW 54.16.040.

After reviewing the participants' agreement in relation to these statutes, we concluded in *Chemical Bank* I that

> this agreement does not satisfy the statutory scheme governing the public participants. (1) The agreement is not a standard contract for the purchase of power because the payments are due irrespective of whether any electric current is delivered. (2) It is not the type of acquisition or construction of a generating project authorized by the statutes or previously recognized by this court, because the participants retained no ownership interest, except in any excess assets upon termination, and a very limited role in management of the project. (3) It is not an exercise of an implied power to pay for municipal services because there was no guaranty the services would be provided and we perceive no legal necessity for such powers. (4) Finally, it is not a joint operating agreement within the provisions of RCW 43.52 because those provisions limit the participants' ability to buy anything more than "electric energy."

*Chemical Bank* I, at 798–99.

Appellants attack this conclusion, arguing that the court did not address important facts which established control and, alternatively, that the issue of ownership control is a

factual one which requires a full hearing on the merits.

Appellants first argue that all participants had statutory authority. As the critical issue to establish statutory authority is control over the project, appellants cite several of the provisions of the participants' agreement to support their theory that the participants exercised control sufficient to establish statutory authority over the projects. We recognize that the agreement did supply some control but still disagree with appellants' position that it was control sufficient to protect the interests of their ratepayers as contemplated by these statutes.

Our conclusion is based upon the reasons set out in *Chemical Bank* I. Also, additional evidence of the limited control exercised by respondents can be gleaned from comparing the more complete indicia of ownership and, therefore, control present in the agreement between Pacific Power and Light Company (Pacific Power) and WPPSS. Pacific Power, as a 10 percent owner of WNP 5, was, by virtue of its ownership agreement, given significant rights over and above those granted to the participants. For instance, while the participants usually had to request information, WPPSS was obligated to keep Pacific Power informed on all significant matters, to confer with it prior to developing proposals and to furnish "any and all other information relating to the planning, construction, operation or maintenance of the Project." Pacific Power and WPPSS Ownership Agreement § 3(a).

Moreover, where the participants' agreement gave respondents rights to proposed WPPSS actions, any proposal submitted by WPPSS to Pacific Power had to include itemized cost estimates and all supporting reports and analyses. Section 3(c). Rather than a 15–day take–it–or–leave–it provision applicable to the participants, Pacific Power was given 30 days to approve proposals, and certain matters could not proceed without Pacific Power's approval. Section 3(d). These included changes in any of the following: site, type of steam supply system, architect–engineer or construction manager. Section 3(e). Disputes

between WPPSS and Pacific Power were to be resolved in the same manner as those between WPPSS and the participants. Section 4(e). The ownership contract, unlike the PA, also specifically required WPPSS to award contracts in a cost effective fashion. Finally, Pacific Power's approval was required on any contract in excess of $500,000. Section 7(e). The participants' approval, on the other hand, was required only on those contracts in excess of $2 million.

In summary, the Pacific Power and WPPSS ownership agreement gave greater control to Pacific Power than that granted to the participants. Our reevaluation of the statutory authority question thus leads us once again to the conclusion that the participants' agreement did not grant ownership control as contemplated by this statutory scheme. No statutory authority, therefore, existed.

Moreover, we reject appellants' assertion that the question of ownership control is essentially a factual inquiry. The participants' agreement and Pacific Power's ownership agreement create the contractual rights of the parties. Interpretation of those agreements is a question of law. *Kelly v. Aetna Cas. & Sur. Co.,* 100 Wn.2d 401, 670 P.2d 267 (1983).

Appellants next contend that the agreements were a valid exercise of authority under the joint operating statutes. They offer three arguments. They assert, first, that recent amendments to the statutes demonstrate legislative recognition of the municipalities' authority, citing RCW 43.52.410, which states that no city or district may enter into a contract "to purchase or participate in a portion of an electrical generating project." Appellants conclude that this amendment is a legislative recognition and therefore ratification of these debts. Next, appellants cite an amendment to RCW 43.52.550 which now provides for a repayment provision for contracts such as these. Third, appellants urge that the narrow construction the court placed on the joint operating statutes defeats their purpose.

Respondents note that appellants' arguments ignore RCW 54.44 which provides specific mechanisms for con-

structing nuclear plants. As discussed in detail in *Chemical Bank* I, we agree. In addition, we find appellants' attempts to find authority in the above cited amendments to be, at best, a strained interpretation of those statutes. Nothing in the legislative history cited by appellants or the statutes themselves specifically authorizes these contracts. At most, the amendments represent a legislative attempt to provide orderly repayment *if* the utilities are found to be liable for the debts. That conclusion does not logically include the proposition that the debts themselves were valid.

Appellants next contend the court erred in concluding that these contracts were not contracts to purchase electricity. Citing cases from two other states, they urge that these statutes, providing for purchase of electricity, are to be construed broadly. This issue was adequately addressed in *Chemical Bank* I and will not be repeated here. Similarly, arguments pertaining to legislative interpretation and implied powers were raised previously. Appellants offer no compelling reasons to alter our decision on these points.

Finally, it has been argued that the court in *Chemical Bank* I ignored the broad general powers granted to cities under article 11, section 11 of our state constitution. This argument is not persuasive. First, the argument has no application to two–thirds of the participants governed by our original decision. Those participants are public utility districts and consequently do not come within the terms of Const. art. 11, § 11. Second, the argument improperly suggests that the general powers of a city may be exercised in derogation of specific statutory schemes.

Article 11, section 11 itself contemplates this limitation in that it allows cities to make only such regulations "as are not in conflict with general laws." Here, the Legislature developed extensive legislation governing the authority of cities and public utility districts to enter into contracts for the purchase of electricity and the ownership of generating plants. As discussed in *Chemical Bank* I, those statutes contained safeguards to protect ratepayers which were ignored. Those safeguards cannot now be subverted by

misplaced reliance on general constitutional provisions.

In summary, we find that appellants' "new" arguments for statutory authority are unpersuasive. Our prior decision is therefore affirmed.

### B. *Ratification*

■ Appellants' argument that the Legislature subsequently ratified these agreements is equally without merit. As a general rule, ratification requires that the act to be ratified be specifically acknowledged by the ratifying legislation. *See generally* 10 E. McQuillin, *Municipal Corporations* § 29.10 (3d ed. 1981).

The amendments cited by appellants contain no such acknowledgment. Moreover, we cannot adopt appellants' suggestion that the amendments *infer* ratification. Ratification by inference is an ambiguous rule and dangerous doctrine requiring that a court second guess the Legislature. This we decline to do.

### C. *Contractual Obligation of Remaining Respondents*

Appellants' next challenge is to the trial judge's order granting summary judgment in favor of those utilities whose contractual obligations were not before the court in *Chemical Bank* I.

Out of the total of 88 participants, 28 are governed by the statutory scheme described above. Since we had concluded that these utilities were not acting within the scope of their authority, the trial judge on remand was faced with the question of what effect release of the municipalities and PUD's had on the obligation of the remaining utilities. On respondents' motion for summary judgment, the judge ruled that the doctrines of failure of condition precedent, commercial frustration or impossibility and mutual mistake all applied. These doctrines, the judge concluded, released the remaining participants' contractual obligations.

Appellants challenge this order, arguing that the trial judge's decision ignores the plain language of the contract and the applicable law. We agree that the trial judge incorrectly relied on the condition precedent analysis, but find

that the doctrines of mutual mistake and commercial frustration both support his conclusion that the remaining participants were not obligated under the contract.

1. *Failure of Condition.* The Restatement (Second) of Contracts § 224 (1981) defines a condition as an event not certain to occur which must occur before performance under a contract becomes due. An event may become a condition by agreement or may be a term supplied by the court. Section 226. The trial judge ruled that section 3 of the participants' agreement created a condition precedent to the formation of the contract. That section states that

> This Agreement shall be effective upon execution and delivery of Participants' Agreements by Supply System and Participants whose Participants' Preliminary Shares total 1.0 [100%] or more.

PA § 3. From this, the trial judge reasoned that the 100 percent (or substantially that) of the participants were required to have authority to enter into the contracts before a duty to perform could be imposed on any participant. We disagree. Section 3 does not establish authority to enter into the contract as a condition precedent to the obligation of all. Section 3 states simply that the contract takes effect when the participants' agreements are executed. Authority to enter into the contract is not mentioned in this section and was thus not made a condition precedent to the participants' obligation.

Furthermore, respondents' attempt to establish statutory authority as a condition of the contract conflicts with the accepted definition of the word "condition". The question of authority does not involve an event not certain to occur but rather a status of certain parties at the time they entered into the contract. For this reason, and that above, we conclude the trial judge erred in viewing section 3 of the participants' agreement as a condition.

2. *Commercial Frustration—Impossibility.* Respondents assert that section 3 of the participants' agreement contemplates 100 percent participation as a material part of the contract. They urge that this court's decision to excuse

28 participants, whose obligation was 70 percent of the total power shares, should result in the contractual release of the remaining participants under the doctrine of commercial frustration or impossibility. We agree.

■ Both the Restatement (Second) of Contracts and our case law recognize commercial frustration and impossibility as independent legal theories that may, on occasion, excuse a party's contractual obligations. Recently, this court recognized and applied commercial frustration. *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*, 96 Wn.2d 558, 562, 637 P.2d 647 (1981).

The doctrine of commercial frustration may be summarized as follows:

Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears.

Restatement of Contracts § 288, at 426–27 (1932). *See also* 18 S. Williston, *Contracts* § 1954 (3d ed. 1978); 6 A. Corbin, *Contracts* §§ 1355, 1356 (1962).

To finance, build or terminate these plants, the municipality and PUD participants were vital. Their share of the projects represents approximately 70 percent of the total obligation. Our decision in *Chemical Bank I* excused these obligations. As the remaining participants did not in any way contribute to this frustration of purpose, we believe contractual release of their obligation is required.

■ 3. *Mutual Mistake.* The trial judge also held that the participants could be excused because all parties were mistaken about the authority of the municipalities. This court applied the doctrine of mutual mistake in *Simonson v. Fendell*, 101 Wn.2d 88, 91, 675 P.2d 1218 (1984). The court described the doctrine's requirements:

A party seeking to rescind an agreement on the basis of mutual mistake must show by clear, cogent and con-

vincing evidence that the mistake was independently made by both parties. *Beaver v. Estate of Harris,* 67 Wn.2d 621, 409 P.2d 143 (1965); *Carson v. Isabel Apartments, Inc.,* 20 Wn. App. 293, 296, 579 P.2d 1027 (1978). A mistake is a belief not in accord with the facts. Restatement (Second) of Contracts § 151 (1981).

Restatement (Second) of Contracts § 152 (1981) notes that a contract is voidable for mutual mistake when

(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

(2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

We find that the assumption that the municipalities and PUD's had statutory authority was a mistaken assumption material to the contract. As discussed later in this opinion, all parties assumed that statutory authority existed. Moreover, the 60 respondents involved in this issue did not assume the risk that no authority existed. If anyone assumed the risk under the terms of section 154,[6] the bondholders did so. They were in a position to obtain judicial determination of the authority question, and did not seek such resolution. We conclude release of the 60 respondents is therefore warranted.

### III
#### AVAILABILITY OF EQUITABLE REMEDIES

Before discussing the equitable obligations of the parties,

---

[6] "A party bears the risk of a mistake when

"(a) the risk is allocated to him by agreement of the parties, or

"(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

"(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." Restatement (Second) of Contracts § 154 (1981).

however, we believe this remedy, as well as the other equitable claims against the *Chemical Bank* I respondents, must be placed in historical perspective.

## A. *Equity's History*

Both sides to this dispute seek the equitable result, but what is equity? One commentator notes that the term is used in two distinct senses. In the first, the word implies right, justice or moral quality. D. Dobbs, *Remedies* § 2.1, at 24 (1973). In another related judicial sense, the word refers to "what was once an entirely separate body of judicial rules, procedures, remedies, and to the separate courts that administered this juridical mass." D. Dobbs, at 24.

## B. *Types of Equitable Remedies*

1. *Estoppel.* Estoppel existed at common law as the principle that a person who asserted a state of affairs should not be allowed to deny the existence of that state thereafter. Equity extended this doctrine. J. Lewis, *Outlines of Equity* 100 (1968). The extension was adopted by the common law; and, by the 19th century both English law and equity held that there would be estoppel where:

> (a) there had been a representation by words or conduct,
> (b) of existing fact, as opposed to law, which was
> (c) intended to be acted upon, and
> (d) was acted upon to his detriment by the person to whom it was made.

J. Lewis, at 100.

English legal history recognized two distinct forms of estoppel: promissory estoppel and estoppel by acquiescence. Promissory estoppel in England has been described as follows:

> Where by words or conduct a party to a transaction makes an assurance to the other which—
> (a) is intended to affect the legal relationship existing between them; and
> (b) is acted upon by the other party who thus alters his position to his detriment;
> the first party will not be allowed to behave in a manner

inconsistent with his assurance. Having given his promise he is estopped from denying its validity.

J. Lewis, at 101.

A second type of estoppel found in English cases, estoppel by acquiescence, may arise "where a person incurs expenditure, or otherwise prejudices himself, in the belief, actively or passively encouraged by the other, that he had or would obtain a sufficient interest in the property to justify such expenditure." J. Lewis, at 102. This form of estoppel can be used not only as a defense but also as a right of action. J. Lewis, at 102.

Estoppel in American case law is well established but unevenly analyzed. It appears that several forms of estoppel exist. Like its English counterpart, estoppel in American case law has been sometimes limited to defensive use and sometimes used affirmatively.

First, American courts, including Washington's, recognize promissory estoppel. It is defined in Restatement (Second) of Contracts § 90(1) (1981):

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Unlike its British equivalent, however, the Restatement does not limit promissory estoppel to use as defense. Nor has Washington's case law done so. *See Klinke v. Famous Recipe Fried Chicken, Inc.,* 94 Wn.2d 255, 616 P.2d 644 (1980).

Second, Washington courts discuss equitable estoppel.[7] In *Klinke,* this court described both promissory estoppel

---

[7]Appellants, who rely on this theory, view equitable estoppel as containing three elements: (1) an admission, statement or act inconsistent with the claim thereafter asserted; (2) action by the other party on the faith of such admission, statement or act; and (3) injury to such other party arising from admission. *Beggs v. Pasco,* 93 Wn.2d 682, 611 P.2d 1252 (1980). Brief of appellant WPPSS, at 57–58. As discussed above, however, we find the concept more complicated than as represented by appellants.

and equitable estoppel:

> Equitable estoppel is based upon a representation of existing or past facts, while promissory estoppel requires the existence of a promise. Equitable estoppel also is available only as a "shield" or defense, while promissory estoppel can be used as a "sword" in a cause of action for damages. Promissory estoppel based on Restatement of Contracts § 90 (1932) has long been recognized in this state and may serve as the basis for an action for damages.

(Footnotes and citations omitted.) *Klinke,* at 258–59. Professor Dobbs, in *Remedies* § 2.3 (1973), agrees equitable estoppel may be used only as a defense. He notes "estoppel is, according to the usual statement, a shield, not a sword. It does not furnish a basis for damages claims, but a defense against the claim of the stopped party." D. Dobbs, at 42.

Not all Washington cases have strictly adhered to this rule. For instance, in *Beggs v. Pasco,* 93 Wn.2d 682, 611 P.2d 1252 (1980), this court acknowledged that the doctrine of estoppel applied to municipalities and then applied it in what appears to be an affirmative manner.[8] Moreover, many cases mingle promissory estoppel with equitable estoppel. *See State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 182 P.2d 643 (1947).

Third, a specialized form of estoppel arises in a series of bond cases decided by our court and the United States Supreme Court at the end of the last century. This form of estoppel, which for clarity's sake we will term estoppel by recital, prohibits a municipality from denying the validity of its bonds under specific circumstances. As these cases are factually similar to the one at hand, a closer look at this form of estoppel is warranted.

---

[8] A close examination of *Beggs v. Pasco, supra,* however, reveals that the court's conclusion that the City was estopped from denying statutory retirement benefits to the plaintiffs came *after* the court concluded that the unchallenged findings of fact placed plaintiffs squarely within the terms of the statute. *Beggs,* at 688. Consequently, the affirmative relief provided by the court was based upon the statute, not the doctrine of estoppel.

One of the early estoppel by recital cases is *Coloma v. Eaves,* 92 U.S. 484, 23 L. Ed. 579 (1875). In *Eaves,* the Court affirmed judgment for a plaintiff who purchased bonds from a municipal corporation. The bonds stated that they had been issued under and by virtue of the law of the state and in accordance with a vote of the electors of the township. In finding for the plaintiff, the Court noted that a bona fide purchaser was not obligated to look beyond such recitals. The Court quoted, with approval, the following rule from *St. Joseph Township v. Rogers,* 83 U.S. (16 Wall.) 644, 21 L. Ed. 328 (1872):

"Power to issue bonds to aid in the construction of a railroad is frequently conferred upon a municipality in a special manner, or subject to certain regulations, conditions, or qualifications; but if it appears by their recitals that the bonds were issued in conformity with these regulations, and pursuant to those conditions and qualifications, proof that any or all of these recitals were incorrect will not constitute a defence for the corporation in a suit on the bonds or coupons, *if it appears that it was the sole province of the municipal officers who executed the bonds to decide whether or not there had been an antecedent compliance with the regulation, condition, or qualification, which it is alleged was not fulfilled.*"

(Italics ours.) *Eaves,* at 492. In subsequent cases, the Court reaffirmed this rule, applying it even when the bonds were issued in excess of a municipality's constitutional debt limit. *See Gunnison Cy. Comm'rs v. Rollins,* 173 U.S. 255, 43 L. Ed. 689, 19 S. Ct. 390 (1898). *Accord, Cuddy v. Sturtevant,* 111 Wash. 304, 190 P. 909 (1920).

In explaining its rationale, the Court in *Gunnison* noted that the rule depended on who makes the recitals and whether their position justifies the public's reliance. The Court noted:

If the officers authorized to issue bonds, upon a condition, are not the appointed tribunals to decide the fact, which constitutes the condition, their recital will not be accepted as a substitute for proof. In other words, where the validity of the bonds depends upon an estoppel, claimed to arise upon the recitals of the instrument, the

question being as to the existence of power to issue them, it is necessary to establish that the officers executing the bonds had lawful authority to make the recitals and to make them conclusive. *The very ground of the estoppel is that the recitals are the official statements of those to whom the law refers the public for authentic and final information on the subject.*"

(Italics ours.) *Gunnison,* at 267 (quoting *Dixon Cy. v. Field,* 111 U.S. 83, 28 L. Ed. 360, 4 S. Ct. 315 (1884)).

In addition to promissory estoppel, equitable estoppel and estoppel by recital, our case law has applied the concept to foreclose denial of certain facts or representations. To prevent injustice then, the court has evoked estoppel in pais, estoppel by misrepresentation, and laches. (*See generally Arnold v. Melani,* 75 Wn.2d 143, 147, 437 P.2d 908, 449 P.2d 800, 450 P.2d 815 (1968) and cases cited therein.) The multiplicity of these terms has obscured rather than clarified the law, however, and is of dubious applicability to this case. We prefer, therefore, to confine our discussion to the three forms of estoppel clearly recognized by the courts and the Restatements as separate doctrines and to the theory of unjust enrichment discussed below.

2. *Unjust Enrichment.* Just as the term "estoppel" has been used widely to describe a variety of legal actions, the term "unjust enrichment" is equally amorphous.

John Dawson notes that, in the English common law, relief for unjust enrichment can be found under many different names, including remedies for disseisin of land, the quid pro quo requirement in an action for debt and remedies in equity for enforcing trust or canceling transfers for fraud and duress. J. Dawson, *Unjust Enrichment* 9 (1951). Relief for unjust enrichment is frequently called restitution. Restitution will be granted in a variety of circumstances, including those involving contractual relief for mutual mistake or commercial frustration. *See* Restatement (Second) of Contracts § 272 (1981); *Simonson v. Fendell,* 101 Wn.2d 88, 675 P.2d 1218 (1984).

We turn now to the application of general principles of

equity to the specific facts of this case.

## C. *Application of Doctrines*

1. *Equitable Estoppel.* As previously suggested, appellants contend that the general principle of equitable estoppel applies to their case because the participants made representations which were relied upon by the bondholders and resulted in injury. We need not decide whether equitable estoppel may properly be used in an affirmative manner, as we conclude the doctrine is inapplicable. First, although equitable estoppel is sometimes applied to municipal corporations, such application is not favored. *PUD 1 v. Cooper,* 69 Wn.2d 909, 918, 421 P.2d 1002 (1966). This disfavor has led courts to conclude that to establish equitable estoppel, every particular must be proven by the plaintiff with clear, cogent and convincing evidence. *PUD 1 v. Cooper, supra.* We believe that plaintiffs have not met this burden.

We find the doctrine is inapplicable because the representations relied upon by the bondholders were representations as to questions of law, not questions of fact. As such, the bondholders should have resorted to a declaratory judgment action to determine the issue of authority. Further, even if the representations are factual, the doctrine of equitable estoppel will not be applied where both parties have the same opportunity to determine the truth of those facts. Consequently, we have observed:

> In order to create an estoppel it is necessary that:
> "The party claiming to have been influenced by the conduct or declarations of another to his injury, was himself not only destitute of knowledge of the state of facts, *but was also destitute of any convenient and available means of acquiring such knowledge; and that where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.*" 11 Am. & Eng. Ency. Law (2d ed.), p. 434.

(Italics ours.) *Leonard v. Washington Employers, Inc.,* 77 Wn.2d 271, 280, 461 P.2d 538 (1969) (quoting *Wechner v.*

*Dorchester,* 83 Wash. 118, 145 P. 197 (1915)).

As suggested earlier in the opinion, the question of statutory authority could and should have been resolved in a declaratory judgment action. As this was not done, the parties cannot now complain of the consequences of their neglect in the matter. For the same reason, we find that the participants are not estopped by their recitals in the bonds.

2. *Estoppel by Recital.* Estoppel by recital (discussed above) leads us to the conclusion that the doctrine is a limited concept applied in very narrow circumstances. There are three requirements for the doctrine's application. First, the municipality must have authority to enter into the transaction. *See South Ottawa v. Perkins,* 94 U.S. 260, 24 L. Ed. 154 (1876). Second, if the plaintiff seeks to establish estoppel based on recitals in a bond, the individual or entity making such recitals must be both authorized to make those recitals, and one on whom the public should be entitled to rely for the truth of the representation. *Gunnison Cy. Comm'rs v. Rollins, supra.* Third, the recital, as in the equitable estoppel cases, must be one concerning facts rather than law. Appellants' case meets only one of these three requirements. Although the municipalities did have general authority to enter into the transactions, we find that the participants are not the final authority on the question of statutory interpretation created by these contracts, and that the representation was legal rather than factual. Those issues in this case are factual and are properly the jurisdiction of a court of law. We conclude that the doctrine of estoppel by recital, as developed in the last century, should not be applied here.

3. *Statutory Estoppel—RCW 62A.8.* Both appellants offer the provisions of article 8 of the Uniform Commercial Code in support of their theory that our statutes prohibit participants from denying payment on these obligations. The trial judge rejected this argument because he believed it was precluded by *Chemical Bank* I. This conclusion is not required by our decision. Thus, a detailed analysis of the issue is in order.

This argument arises from the court's repeated reference to the municipal participants as guarantors. In *Chemical Bank* I, the court repeatedly stated that the agreement was essentially an unconditional guaranty of payment. *Chemical Bank* I, at 784, 786, 798. RCW 62A.8–201(2) provides that a "guarantor is an issuer to the extent of his guaranty whether or not his obligation is noted on the security." The conclusion that a guarantor is an issuer is important because it triggers the provisions of RCW 62A.8–202. That section provides:

> (1) Even against a purchaser for value and without notice, the terms of a security include those stated on the security and those made part of the security by reference to another instrument, indenture or document or to a constitution, statute, ordinance, rule, regulation, order or the like to the extent that the terms so referred to do not conflict with the stated terms. Such a reference does not of itself charge a purchaser for value with notice of a defect going to the validity of the security even though the security expressly states that a person accepting it admits such notice.
>
> (2)(a) A security other than one issued by a government or governmental agency or unit even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect.
>
> (b) The rule of subparagraph (a) applies to an issuer which is a government or governmental agency or unit only if either there has been substantial compliance with the legal requirements governing the issue or the issuer has received a substantial consideration for the issue as a whole or for the particular security and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security.

RCW 62A.8–202(1), (2). Comment 6 to the rule states that the rule is based on the estoppel by recital cases discussed above. The Washington comment to this section states that the statute has substituted two criteria for the recital

requirement. First, there must be substantial compliance with the statute's governing issue. Second, the municipality must have received substantial consideration and the stated purpose must be within the power of the issuer. *See* Comment, RCWA 62A.8–202.

Respondents assert that this statute is inapplicable. They first argue that the participants are not issuers. Several theories are offered to support this proposition, none of which we find persuasive. They alleged, for instance, that the participants are not guarantors because the only basis for finding a guarantor relationship is the participants' agreement which this court has already ruled invalid. Respondents' arguments are circular and not supported by authority.

Respondents' next argument for evading the terms of RCW 62A.8–202(2)(b) is that no securities have been challenged, because everyone admits the validity of the bonds. Respondents have repudiated only the participants' agreement, and this agreement has already been determined not to be a security by the trial judge. Because this conclusion was not challenged on appeal, respondents assert that it is now the law of the case. This argument is appealingly simple. It ignores, however, the history of this case which, originally, came to this court on discretionary review of an interlocutory order. As such, appellants were not obligated to appeal every adverse decision against them. Furthermore, this court narrowly tailored the issues on review in *Chemical Bank* I. Thus, it would be unjust to preclude the argument on procedural grounds. Respondents' argument is therefore rejected.

Nonetheless, we agree that the PA does not fall within the terms of RCW 62A.8–202. We conclude the PA does not meet the statute's definition of a security. RCW 62A.8–102 defines the word security very narrowly. It states:

    (1) In this Article unless the context otherwise requires
    (a) A "security" is an instrument which
    (i) is issued in bearer or registered form; *and*
    (ii) is of a type commonly dealt in upon securities

exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; *and*

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; *and*

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

(Italics ours.)

The participants' agreements are not issued to a bearer, they are not registered or commonly dealt in as a medium for investment, and are not one of a class. In fact, of the above requirements, only (iv) applies to the participants' agreement. Appellants argue, nonetheless, that the participants' agreement was an integral component of the bonds and therefore should be considered as falling within the parameters of this statute. Appellants cite no case authority[9] for this proposition and offer no compelling policy reasons for extending the definition of security to this agreement.

We conclude that the participants' agreement does not meet this definition. RCW 62A.8–202 is therefore inapplicable.

## D. *Unjust Enrichment*

As noted above, a party must make restitution when he has been unjustly enriched at the expense of another. Restatement of Restitution § 1 (1937). The Restatement (Second) of Restitution § 1 (Tent. Draft No. 1, 1983) contains a slightly different formulation of this general principle. It states:

---

[9]Appellants cite RCW 62A.8–201(2) to support their allegation that the participants' agreement is part of the security. That section states:

(2) With respect to obligations on or defenses to a security a guarantor is an issuer to the extent of his guaranty whether or not his obligation is noted on the security.

This section does not address, however, a situation where, as here, the invalidity is in the separate agreement rather than the security. We decline, therefore, to read this section as suggested by appellants.

A person who receives a benefit by reason of an in–fringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.

Each of these statements, however, involves the transfer of benefit from one party to another. It does not require, as respondents infer, that the benefit still exist. As noted in comment *b* to the Restatement of Restitution § 1 (1937),

[a] person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word "benefit," therefore, denotes any form of advantage.

Restatement, at 12.

The definition of benefit is critical to appellants' argument because respondents allege that the bondholders did not confer a benefit on the participants. This argument and the related question of whether justice requires restitution in this case will be addressed later in the opinion. We turn first, however, to an argument which pertains only to those respondents whose contractual obligations were held to be ultra vires by our decision in *Chemical Bank* I.

▮▮▮ Respondents, citing 10 E. McQuillin, *Municipal Corporations* § 29.04 (1981) and *Finch v. Matthews,* 74 Wn.2d 161, 443 P.2d 833 (1968), contend that the unjust enrichment theory cannot be applied against a municipality where the acts are substantively ultra vires. We agree and, for the reasons set out below, find the acts substantively ultra vires.

A substantive/procedural dichotomy appears in virtually every ultra vires case.[10] The general rule, stated most re-

---

[10]As noted throughout this opinion, courts often grant relief against a municipality under the various equitable theories discussed above. Each equitable doctrine seems to adopt this procedural versus substantive dichotomy, however. Thus, though the discussion of the distinction is contained in this section of the

cently in *Noel v. Cole,* 98 Wn.2d 375, 655 P.2d 245 (1982), states that a private party, acting in good faith, may recover from a governmental agency if the agency "had the power it sought to exercise but merely . . . exercised it in an irregular manner or by unauthorized procedural means", and the action was not malum in se, malum prohibitum or manifestly against public policy. *Noel,* at 381. Not surprisingly, both sides assert that this rule supports their position. Appellants argue that the municipalities had broad general statutory authority to enter into contracts for purchase of electricity and generating plants. They conclude that the only error was a procedural one, that is, the contracts did not clearly set out a sufficient ownership interest to protect ratepayers. Respondents counter with the allegation that *Chemical Bank* I already decides the issue of whether the contracts were procedurally or substantively ultra vires.

We believe the instant case falls within this rule. As we concluded in *Chemical Bank* I, "the Washington statutes authorize the participants to purchase power or to own electric generating facilities." *Chemical Bank* I, at 799. If the contracts had been for these purposes, the participants would have had statutory authority. They were not. The doctrine of substantively ultra vires activity thus precludes recovery.

■■■ As noted above, the Restatement's definition of benefit is quite broad. Thus, our task here is to determine whether any asserted benefits fall within this definition. We conclude they do not.

We find persuasive respondents' theory that the benefits of the bond revenues flowed to WPPSS and no further. WPPSS contracted with the bondholders, received their money and appropriated it for its purposes. We can see no benefit to the participants in these circumstances.

In summary, we find no benefit passed to the respon-

opinion, the conclusion that the acts were only procedurally ultra vires applies to the other theories herein discussed.

dents and, thus, justice does not require restitution. More-over, restitution against those respondents released by our decision in *Chemical Bank* I is precluded because their activities were substantively ultra vires.

## IV
### CONSTITUTIONAL CLAIMS

■■■ Appellants assert that the United States Constitu-tion and the Washington State Constitution would be vio-lated if they are denied relief. Appellants do not rely directly on any one provision of the constitutions but instead extract general principles from cases under the contract clause, U.S. Const. art. 1, § 10, cl. 1; the takings clause, U.S. Const. amend. 14, § 1; and the due process clause, U.S. Const. amend. 14, § 1. Appellants' arguments depend upon reading the various clauses together. No case has done so. Moreover, authority cited in appellants' briefs do not support their theory. For instance, *Kaiser Aetna v. United States,* 444 U.S. 164, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979) involved a simple application of the takings clause to action by the federal government. Petitioner, Kai-ser Aetna, leased and improved a private tidal pond which had no access to the ocean. After petitioner dredged the pond, created ocean access and a marina, the federal gov-ernment sought to enforce a public right of access to the pond. The Supreme Court held that this could not be done without compensation to petitioner. *Kaiser* thus supports only the proposition that the government may not take private property without compensation. Here, no taking occurred.

Likewise, the State has not impaired a contract obliga-tion. When a city acts beyond its specific statutory author-ity, no contract obligation is created. The contract is void. *Chemical Bank* I.

Appellants' due process argument is equally unpersua-sive. No cases have held that a court's ruling, as a matter of law, that a contract is unenforceable, violates due process. In summary, the rule suggested by appellants would effec-

tively vitiate a court's ability to invalidate contracts. This we decline to do.

We find that the bondholders' interests have been adequately represented in this case. Their motion to intervene is denied. We reject appellants' attacks on our decision in *Chemical Bank* I and their equitable arguments. The trial judge's decision is affirmed.

WILLIAMS, C.J., and BRACHTENBACH, DORE, DIMMICK, and PEARSON, JJ., concur.

UTTER, J. (dissenting)—I dissent from the majority's conclusion that this court should not review its holding reached in *Chemical Bank v. WPPSS*, 99 Wn.2d 772, 666 P.2d 329 (1983). The provisions of RAP 2.5(c)(2) clearly authorize reconsideration.

> The appellate court may at the instance of a party review the propriety of an earlier decision of the appellate court in the same case and, where justice would best be served, decide the case on the basis of the appellate court's opinion of the law at the time of the later review.

The history of this rule indicates it was adopted by this court for precisely the situation we now face, a situation where adherence to the earlier ruling as the rule of the case would be both unwise and a perpetuation of earlier error. As of the date of this opinion, at least four scholarly publications have reviewed the court's initial opinion and all four are critical of its conclusion and the reasoning used to justify it. Comment, *Chemical Bank v. WPPSS: A Case of Judicial Meltdown*, 5 J. Energy L. & Pol'y 273 (1984); Comment, *Chemical Bank v. Washington Public Power Supply System: An Aberration in Washington's Application of the Ultra Vires Doctrine*, 8 U. Puget Sound L. Rev. 59 (1984); Note, *A Cry for Reform in Construing Washington Municipal Corporation Statutes*, 59 Wash. L. Rev. 653 (1984); Note, *Chemical Bank v. Washington Public Power Supply System: The Questionable Use of the Ultra Vires Doctrine To Invalidate Governmental Take-or-Pay Obli-*

*gations,* 69 Cornell L. Rev. 1094 (1984). Events occurring since publication of our first opinion make clear it will in no way spare the people of this state continuing costs of litigation and exposure to liability. On October 15, 1984, investors who bought bonds for WNP 4 and WNP 5 filed a claim for $7.25 billion against the State of Washington. The entire populace of the state is now potentially liable, including those areas that specifically rejected participation.

The majority fails to convincingly deal with the question of how this court can make a finding of fact on disputed evidence contrary to all our previous case law. The appellants will undoubtedly ask for federal review on this ground. In the event they do, the United States Supreme Court should exercise its discretion and accept this case for review. Our court's action is similar to that taken by many state courts in the Reconstruction era which were reversed on constitutional grounds by the United States Supreme Court.

In *Gelpcke v. Dubuque,* 68 U.S. (1 Wall.) 175, 17 L. Ed. 520 (1863), the Supreme Court rejected the Iowa Supreme Court's refusal to enforce railroad bonds.

> [I]f the contract, when made, was valid by the laws of the State as then expounded by all departments of the government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent action of legislation, or decision of its courts altering the construction of the law."

*Gelpcke,* at 206. Many subsequent decisions during the Reconstruction era went even farther. *See generally* C. Fairman, *History of the Supreme Court of the United States* 918–1116 (1971).

The Supreme Court continues to invoke the takings clause and the contracts clause to protect citizens from the transfer of private property to public purposes by governmental action. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 66 L. Ed. 2d 358, 101 S. Ct. 446 (1980); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,*

459 U.S. 400, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983). In this century, most takings and contracts clause cases respond to legislative, not judicial action. Nonetheless the United States Supreme Court continues to recognize that state courts may not "redefine" as public what had been vested private rights. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. at 164 (restraining Florida Supreme Court from "transform[ing] private property into public property without compensation").

## I

I disagree with the majority on a number of grounds in its ruling that the Washington public utility districts (PUD's) and Washington municipal participants lacked authority to enter into their respective agreements. Although it is difficult for this court to admit it was in error in the largest case to come before this court in its history, we should do so now. By so doing we would let the normal legal processes resolve this dispute on the facts and the law which should be applied.

## A

The majority opinion throws into confusion a body of municipal law carefully developed over many years prior to this case which granted to municipalities broad authority in the exercise of their police powers. This power to manage their own affairs, subject to broad legislative guidance, has been carefully built into our constitution, statutes and case law. Our own recent cases, not mentioned by either majority opinion, confirm this. *Issaquah v. Teleprompter Corp.,* 93 Wn.2d 567, 611 P.2d 741 (1980) and *United States v. North Bonneville,* 94 Wn.2d 827, 621 P.2d 127 (1980).

Prior to *Chemical Bank* I, this court liberally construed powers given to first class and code cities. *Winkenwerder v. Yakima,* 52 Wn.2d 617, 622, 328 P.2d 873, 878 (1958). RCW 35.20.900. In determining whether municipalities were given certain powers to act, we have liberally applied the "reasonable necessity test" where police power actions are involved. *Scott Paper Co. v. Anacortes,* 90 Wn.2d 19, 29,

578 P.2d 1292, 1298 (1978); *Hunter v. North Mason High Sch.*, 85 Wn.2d 810, 817, 539 P.2d 845, 849 (1975).

By finding no express authority to enter into the participants' agreement (PA) in *Chemical Bank* I, this court did not comment on several earlier accepted rulings. In the majority opinion, first class and code cities were given the same restrictive interpretation of their statutory authority as were other cities. This is contrary to our own consistent line of earlier authority. *Winkenwerder v. Yakima, supra.*

The majority inadequately deals with our previous holdings which have placed actions involving public works within the liberally interpreted police powers of cities, counties and towns. *Housing Auth. v. Seattle*, 56 Wn.2d 10, 15, 351 P.2d 117, 120 (1960); *Kaul v. Chehalis*, 45 Wn.2d 616, 625, 277 P.2d 352, 357 (1954); and *Morse v. Wise*, 37 Wn.2d 806, 810–11, 226 P.2d 214, 216 (1951).

The court in its majority opinion also erroneously interprets the legislative intent expressed in our statutes that authorize certain municipal corporations to construct, acquire and operate electric generating facilities. RCW 35.92.050 and 54.16.040. These statutes focus on control over the electricity produced, rather than on control over the facilities, as emphasized by the majority.

The legislative declaration requiring broad construction of joint operating agency statutes is ignored by the majority. *See* RCW 43.52.910. Instead, its opinion strictly construes RCW 43.52 to achieve what I believe is a nonexistent distinction between powers of a joint operating agency and powers of its participants. RCW 43.52.910.

I also disagree with that portion of the majority opinion dealing with implied statutory authority. Contrary to our general liberal interpretation of police power statutes, the court relied on taxation, not police power decisions, to hold that the test for implied powers is legal necessity instead of the fairly implied or reasonable necessity test. *See, e.g., Scott Paper Co. v. Anacortes*, 90 Wn.2d 19, 29, 578 P.2d 1292, 1298 (1978). Taxation cases are totally inapplicable inasmuch as they rely on different constitutional provisions

than the police power cases. Const. art. 7, §§ 5, 9; art. 11, § 12. In *Hillis Homes, Inc. v. Snohomish Cy.,* 97 Wn.2d 804, 809, 650 P.2d 193, 195 (1982), the court required express statutory authority under the wording of article 11, section 12, a taxation provision. On the other hand, Const. art. 11, § 11 provides:

> Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws.

This section is effective without legislative enactment and is a more direct grant of authority than that found in the taxation sections. *Patton v. Bellingham,* 179 Wash. 566, 570, 38 P.2d 364, 365 (1934). This court's earlier attempt to distinguish *Municipality of Metro Seattle v. Seattle,* 57 Wn.2d 446, 460, 357 P.2d 863, 872 (1960) fails, due to its basic error which confuses tax cases with police power cases.

Serious questions remain regarding the impact of our decision, if unchanged, on future Washington law. Note, *A Cry for Reform in Construing Washington Municipal Corporation Statutes, supra* at 667–69. Any action not backed by the clearest express authority may well be found to be ultra vires. Legal opinions regarding municipal authority will be difficult to give and municipal projects, without legislative or judicial approval of municipal authority, difficult to market. Municipal corporations are deprived of the opportunity for innovative solutions to their problems in the absence of a clear expression of legislative or judicial approval. The decision provides a fertile ground for judicial challenge to major municipal undertakings and limits the ability of municipal corporations to work between themselves to solve their common problems. Declaratory judgment proceedings will increase, of necessity, adding to overcrowded court dockets, diversion of scarce judicial resources and increased cost to taxpayers of time and money.

Most seriously, municipal corporations will be required to increasingly ask for legislative clarification of their

authority. Given the Legislature's limited schedule, significant time lags between identification of problems and legislatively authorized solutions will be commonplace.

### B

There are some 28 Washington municipalities and PUD's as participants involved in Washington Public Power Supply System (WPPSS). The question of whether they had statutory authority to enter into their respective agreements was the subject of *Chemical Bank* I. Of these participants, 19 are PUD's and 9 are Washington cities of various classes. PUD's are granted authority to purchase electricity under the terms of RCW 54.16.040.[11] Each class of municipal participant had similar grants of authority to purchase electricity. *See, e.g.,* RCW 35.23.440(43); RCW 35.24.290(3); RCW 35.27.370(4); and RCW 35A.80.010.

In addition to the previously cited authority, the statutes creating WPPSS add an additional layer of statutory

---

[11]RCW 54.16.040 provides:

"A district may purchase, within or without its limits, electric current for sale and distribution within or without its limits, and construct, condemn and purchase, purchase, acquire, add to, maintain, conduct, and operate works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam, or other methods, within or without its limits, for the purpose of furnishing the district, and the inhabitants thereof and any other persons, including public and private corporations, within or without its limits, with electric current for all uses, with full and exclusive authority to sell and regulate and control the use, distribution, rates, service, charges, and price thereof, free from the jurisdiction and control of the utilities and transportation commission, in all things, together with the right to purchase, handle, sell, or lease motors, lamps, transformers and all other kinds of equipment and accessories necessary and convenient for the use, distribution, and sale thereof: *Provided,* That the commission shall not supply water to a privately owned utility for the production of electric energy, but may supply, directly or indirectly, to an instrumentality of the United States government or any publicly or privately owned public utilities which sell electric energy or water to the public, any amount of electric energy or water under its control, and contracts therefor shall extend over such period of years and contain such terms and conditions for the sale thereof as the commission of the district shall elect; such contract shall only be made pursuant to a resolution of the commission authorizing such contract, which resolution shall be introduced at a meeting of the commission at least ten days prior to the date of the adoption of the resolution: *Provided further,* That it shall first make adequate provision for the needs of the district, both actual and prospective."

authority to purchase electricity. Creation of a joint operating agency is authorized which "shall have authority" (1) to generate, produce, transmit, deliver, exchange, purchase or sell electric energy and to enter into contracts for any and all such purposes, RCW 43.52.300(1); (2) to construct, condemn, purchase, lease, acquire, operate, develop and regulate facilities for the generation of electric energy, RCW 43.52.300(2); (3) to enter into contracts for sale, exchange, transmission or use of electric energy, RCW 43.52.300(3), (4); (4) to act as agent for the purchase and sale at wholesale of electricity for any city or district whenever requested to do so, RCW 43.52.300(7). The Legislature mandated that these statutes be liberally construed to effectuate their purposes. RCW 43.52.910.

A third category of statutes grants cities and PUD's the authority to enter into joint operating agencies for the purpose of developing nuclear power. RCW 54.44.020 requires that the utility or city

> shall own a percentage of any common facility equal to the percentage of the money furnished or the value of property supplied by it for the acquisition and construction thereof and shall own and control a like percentage of the electrical output thereof.

That chapter also limits the participant's liability to its own acts and forbids the participant from assuming any of the other participants' debt or obligation. RCW 54.44.030.

A fourth category grants cities and PUD's authority to construct energy facilities on their own. They are authorized by RCW 35.92.050 to construct, condemn, purchase and acquire facilities for the purpose of furnishing the city or town or its inhabitants with electricity.

The court's opinion in *Chemical Bank* I reasoned that the participants' agreement with WPPSS failed to satisfy the statutory scheme governing public participants for a number of reasons. The majority held: (1) The agreement is not a standard contract for the purchase of power because the payments are due irrespective of whether any electric current is delivered. (2) It is not the type of acquisition or

construction of a generating project authorized by the statutes or previously recognized by this court, because the participants retain no ownership interest, except in any excess assets upon termination, and a very limited role in management of the project. (3) It is not an exercise of an implied power to pay for municipal services because there was no guaranty the services would be provided and we perceive no legal necessity for such powers. (4) Finally, it is not a joint operating agreement within the provisions of RCW 43.52 because those provisions limit the participants' ability to buy anything more than "electric energy". *Chemical Bank* I, at 798–99.

I have previously stated why, as a matter of law, I believe the majority was incorrect. The majority in *Chemical Bank* I is also in error when it assumes, as a matter of fact, that ownership, or its equivalent in terms of control, did not exist under the facts of this case. In *Chemical Bank* I, at pages 787–88, the majority, in referring to the complexity of budgets and construction decisions, states that it was "unlikely that a part–time committee . . . could provide significant input" and asserts that the participants' committee "apparently served as a rubber stamp".

For the majority to resolve these issues as factual conclusions violates Washington Constitution article 4, section 6, which gives to the trial courts the sole authority to decide factual issues.

> Factual disputes are to be resolved by the trial court. . . . The power of this court is appellate only, which does not include a retrial here but is limited to ascertaining whether the findings are supported by substantial evidence or not. If we were so disposed, but we are not, we are not authorized to substitute our judgment for that of the trial court.

*Stringfellow v. Stringfellow*, 56 Wn.2d 957, 959, 350 P.2d 1003 (1960).

The majority in *Chemical Bank* I, and today, incorrectly relies on *Kelly v. Aetna Cas. & Sur. Co.*, 100 Wn.2d 401, 670 P.2d 267 (1983) to justify this court's authority to

resolve issues of ownership control by characterizing them as questions of law rather than fact. The interpretation of the participants' agreement, the majority asserts, is solely a matter of law. Its statement of the law contained in *Kelly* is incomplete, however, for the interpretation or legal effect of a contract is a matter of law for the court *only* in the absence of disputed facts. *Yeats v. Estate of Yeats,* 90 Wn.2d 201, 580 P.2d 617 (1978); *Epperly v. Seattle,* 65 Wn.2d 777, 399 P.2d 591 (1965). *See generally* 4 S. Williston, *Contracts* § 616 (3d ed. 1961); 3 A. Corbin, *Contracts* §§ 554, 595 (1960 & Supp. 1984).

In *Kelly,* an insurance law case, the Washington Supreme Court found summary judgment appropriate where a complete factual record had been developed and no dispute other than the legal meaning of a term contained in an insurance policy existed. The court found the interpretation of the term "owner" to be a question of law. The decision in *Kelly* is consistent with the established legal principle that the interpretation or legal meanings of specific terms within insurance contracts is generally a question of law. *See Pacific Indem. Co. v. Bloedel Timberlands Dev., Inc.,* 28 Wn. App. 466, 624 P.2d 734 (1981); *see generally* E. Farnsworth, *Contracts* 515–17 (1982). In *Kelly,* we engaged in no weighing of evidence or trying of facts.

Unlike *Kelly,* the present case presents numerous factual disputes which go well beyond the mere legal definition of terms. Since numerous factual questions relating to the actual operation of the participants' agreement exist, consistency with both Washington contract and constitutional law requires that a full factual record be developed and that all factual disputes be resolved at the trial level.

Even if the majority correctly resolved the issues of ownership and control, however, it did not by so doing answer all of the necessary issues that remained before the court for decision. As a matter of statutory interpretation, not all the statutes pertaining to the PUD's and municipalities require ownership. Some, such as RCW 35.92.050, on their face authorize schemes similar to the participants' agree-

ment. While the first portion of RCW 35.92.050 speaks to ownership interests, the statute also states that a city or town may

> authorize the construction of such plant or plants by others for the same purpose, and purchase gas, electricity, or power from either within or without the city or town for its own use and for the purpose of selling to its inhabitants and to other persons doing business within the city or town and regulate and control the use and price thereof.

This provision was an integral part of Judge Coleman's decision at the trial level, is not adequately dealt with by the majority, and provides authority for the participants to act.

As another alternative, were this court to find the majority's conclusions in *Chemical Bank* I correct, appellants argue that, on the record, 20 of the participants had control by virtue of their membership in WPPSS. Those 20 participants represent 68 percent of the project's shares and held 88 percent of the voting power on WPPSS. As to these participants, the statutes governing WPPSS grant them both ownership and management control over the projects. *See* RCW 43.52.370 and 43.52.374 (management and control of joint operating agency vested in a board composed of member utilities and outside directors); RCW 43.52.360 (after dissolution, members hold assets as tenants in common). The majority in *Chemical Bank* I also failed to address itself to this argument. Given this degree of control over the projects by the large majority of the participants, this court was in error in concluding as a matter of law, without further factual inquiry, that these participants lacked sufficient control over the projects to protect their ratepayers.

Even if the majority's conclusion that the participants did not have an ownership interest in WNP 4 and WNP 5 was correct, the participants' committee provided the participants with a vehicle to exert their management control. Although I cannot disagree with the majority's determina-

tion that "the participants' committee apparently served as a rubber stamp for WPPSS' decisions," *Chemical Bank I*, at 788, courts have consistently recognized in securities litigation that investors who fail to exercise opportunities for control available to them cannot later claim they lacked control. *See, e.g., Mr. Steak, Inc. v. River City Steak, Inc.*, 460 F.2d 666 (10th Cir. 1972), *aff'g* 324 F. Supp. 640 (D. Colo. 1970). Absent documentation that their attempts to control debt exposure through the WPPSS participants' committee were frustrated, this court and the federal courts should not permit the participants to argue they had no management control.

For all the above stated reasons, I would affirm the summary judgment granted by the trial court in all respects. Our failure to find authority exists for the participants to enter into the agreements raises serious questions as to the basis upon which Washington nuclear power plants 1, 2 and 3 were built. These plants were built with the same basic agreements as those entered into by the participants in WNP 4 and WNP 5, with the added benefit of net billing. If the participants did not have authority to enter into the agreements for plants 4 and 5, they could not now assert the right to participants' shares in a working plant. Such a conclusion could well force the Bonneville Power Authority to seize the participants' interests in plants 1, 2 and 3.

## C

By ruling only on the authority issue, the court in *Chemical Bank I* did not address the other issues before the court in that case. The lower court's ruling should be discussed on these matters inasmuch as it was correct in every respect and the factual issues remaining to be resolved should proceed to trial.

The trial court did not abuse its discretion in deciding to strike the jury demand. Its reliance on *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 617 P.2d 704 (1980) was proper. There we noted, "[i]n determining whether a case is primarily equitable in nature or is an action at law, the trial

court is accorded wide discretion, the exercise of which will not be disturbed except for clear abuse." *Brown,* at 368. The trial judge explicitly applied in his analysis the factors required in the *Brown* case. He first considered that the issues raised were an affirmative defense, but looked beyond the pleadings to the true nature of the allegations and concluded that this was, in fact, an action for rescission.

The court acted within its authority and no showing has been made that there was a reversible abuse of discretion. The record supports its conclusion that the participants' equitable affirmative defense was to seek rescission of the contract and that this is not a case of a defendant attempting to destroy the right to a jury by asserting equitable defenses; that participants seek both equitable relief and a jury; that the main issues are equitable; that the equitable issues are complex; that only the equitable issues remain to be tried if the other aspects of its ruling are upheld; that the overall nature of the action is not doubtful; and lastly, that the real issues in dispute are equitable.

The trial court also properly determined that the liabilities incurred by the participants did not exceed statutory or constitutional debt limitations. The determinative issue is whether the participants' liabilities are a debt for constitutional debt limitation purposes. This court has defined "debt" in the context of article 8 to mean "borrowed money; it denotes an obligation created by the loan of money, usually evidenced by bonds but possibly created by the issuance of paper bearing a different label." *State ex rel. Wittler v. Yelle,* 65 Wn.2d 660, 668–69, 399 P.2d 319 (1965). We have in the past consistently held that the provisions of article 8, section 6 of the Washington Constitution do not apply under revenue financing conducted through the bases of the "special fund" doctrine. The rationale behind this exemption is that obligations payable not from general tax revenues but from a special fund are not debts of the municipality in a constitutional or statutory sense. *State ex rel. State Fin. Comm. v. Martin,* 62

Wn.2d 645, 661, 384 P.2d 833 (1963). The parties designed this revenue bond program to conform to the requirements of the special fund doctrine. The source of the payments on the bond are either (1) revenues generated from the projects, or (2) revenues pledged by participating public utilities. As such, according to our previous rulings, the participants' obligations do not fall within the constitutional or statutory debt limitations.

Finally, the trial court properly held that the contracts obligate the participants to pay costs of decommissioning in debt service. Decommissioning costs refer to payments to contractors for work done on the projects as well as payments to settle contracts interrupted when the projects were terminated. PA § 13(a)(ii), at 36–37. Debt service refers to the principal and interest payments to the bondholders.

To resolve whether the trial court correctly interpreted the obligation of the participants to pay the costs of decommissioning in debt service requires an examination of the participants' agreement and bond resolution (BR). Interpretation of the agreement is governed by the fact that the projects were terminated pursuant to section 13 of the participants' agreement but that termination occurred prior to the completion of the projects. Project financing was structured so that payment sources depended upon whether the project was under construction, operating or terminated. There are three key definitions involved: "contract year", "billing statement" and "annual budget".

"Contract year" as defined in the participants' agreement starts on the earliest of three dates: "(i) the earlier of the Dates of Continuous Operation of any of the Plants or (ii) on July 1, 1988, or (iii) the date one year after the date of termination of the Project as provided in Section 13". PA § 1(g), at 7. These trigger dates represent the possible commencement of participant payments. After the contract year begins, the monthly billing statement determines the amount to be paid the supply system by the participant. PA § 1(b), at 4–5. That amount is calculated by multiplying

the participant's share by the amount of the annual budget less payments from other sources, and adding the cost of fuel. Finally, annual budget is defined as:

"Annual Budget" means the budget adopted by Supply System pursuant to Section 8(b) with respect to the Projects and which itemizes the estimated costs of each Project, commencing with (i) the Date of Continuous Operation of the Plant related to such Project, or (ii) July 1, 1988, or (iii) the date one year after the date of termination of a Project as provided in Section 13, whichever is earliest, exclusive of costs of construction as defined in the Bond Resolution, and costs of fuel, applicable to the respective Contract Year . . . The Annual Budget, as amended from time to time, shall make provision for all such Supply System's costs, including accruals and amortizations, resulting from the ownership, operation and maintenance of the Projects, repairs, renewals, replacements, and additions thereto and costs of termination thereof as provided in Section 13, together with the amounts over or under billed in accordance with subsection (b) below. The Annual Budget shall include, but not be limited to, (i) the amounts which Supply System is required under the Bond Resolution to pay in each Contract Year into the various funds provided for in the Bond Resolution from the Revenue Fund, as therein defined, for debt service and all other purposes . . .

PA § 1(a), at 3–4.

Prior to the three possible trigger dates, which were (1) 1 year after the termination of the project; or (2) July 1, 1988; or (3) the date of continuous operation of a plant, payment of the project's costs were not made by participants. Instead, bond proceeds were used. However, after the so-called trigger dates, participant payments are required to begin through the annual budget.

The trial court correctly determined that under the applicable provisions of the participants' agreement, decommissioning costs are unequivocally included in the annual budget. The projects were correctly terminated pursuant to section 13 of the participants' agreement which requires WPPSS to begin decommissioning the projects and make monthly accounting statements to the partici-

pants. The annual budget definition expressly includes "costs of termination thereof as provided in Section 13". PA § 1(a), at 4. The final accounting section 13 requires is a final report to the participants as to any remaining decommissioning costs.

The agreements established successive sources of payments to the bondholders for the costs of debt service. First, when bonds are being sold to finance the projects, BR § 6.8A2, at 42–43 requires WPPSS to pay from bond proceeds into the bond fund amounts necessary to provide for payment of interest on the bonds. These payments are defined as a "cost of construction." BR § 6.9F, at 46. It is apparent these provisions were drafted to anticipate ongoing construction and bond sales. Inasmuch as these two activities are not indefinite, the parties provided for three "trigger" dates at which time alternative means of funding would be used. Under section 6.2 of the bond resolution, that date is the earliest of: (1) 1 month from the date of continuous operation (at which time operating revenues, at least in part, would begin to pay for the debt); or (2) July 25, 1988 (the presumed latest date for construction to be completed); or (3) 1 year after the date of termination. BR § 6.2A(1)–(3), at 29–31. As structured, there were "successive" sources of payment depending upon whether the projects were under construction, operating or terminated. Because the plants were terminated in January of 1982, the third alternative source would apply.

Under this latter provision, WPPSS must pay from the revenue fund to the bond fund "cost[s] of termination", *i.e.,* amounts necessary to satisfy the debt payments. BR § 6.2A(3), at 31. The definition of annual budget in the participants' agreement expressly includes "debt service", PA § 1(a), at 4, which means the participants must pay these amounts.

Respondents make several arguments. Their argument that the documents do not provide for "dry hole" risks is erroneous. The bond resolution provides for payment from "money pledged hereunder" which includes, by necessity,

participants' revenues and does not depend on revenues generated by the project or general obligation bonds. Appellants argue that the costs of construction are explicitly exempted from the annual budget, PA § 1(a), at 3, which means that debt service is payable only from amounts properly payable into the revenue fund. The trial court correctly found that BR § 6.2A(3) resolves this problem. Finally, respondents argue they are not obligated to pay for any debt service because the annual budget definition limits debt service to payments from the "revenue fund". PA § 1(a), at 4. Respondents correctly point out that section 6.1 only defines what goes into the revenue fund, but that under section 6.2, WPPSS is required to pay for all unfunded debt service. Participants' pledged revenues must be used to pay those obligations.

For the foregoing reasons, I would affirm the initial ruling of the trial court which leaves for trial the equitable defenses asserted by the respondents. I would also deny bondholders' motion to intervene.

## II

While I agree with a major part of the discussion by the majority regarding the history of the development of equitable remedies, it is important to first note that the history of our legal system suggests several general principles which shape the application of equitable relief. First, although lawyers generally speak of law and equity as separate concepts, history belies this characterization. Law and equity had common origins and goals. *See generally* W. deFuniak, *Modern Equity* 6 (2d ed. 1956); F. Maitland, *Equity* 15 (1949). They were brought to England via the Normans, diverged as the need arose to preserve individual jurisdiction and merged again as that need abated. F. Maitland. Second, each legal system attempted to do justice within the confines of its procedural limitations and each, at some point, was more rigid in its rules than the other. G. Keeton & L. Sheridan, *Equity* 3 (1969). Third, both legal systems seem to have borrowed from each other during the period

in which they had separate identities. Since that time, both systems have adopted concepts wholesale. One rule, common to both, is the proposition that the law will enforce promises.

Washington has consistently recognized equitable principles and enforced promises in specific circumstances. Our courts have stated: Equity will not suffer a wrong to be without a remedy, *Rummens v. Guaranty Trust Co.,* 199 Wash. 337, 346–47, 92 P.2d 228 (1939); equity treats that as done which by agreement is to be done, *Fleishbein v. Thorne,* 193 Wash. 65, 72, 74 P.2d 880 (1937); and he who comes into equity must come with clean hands, *Langley v. Devlin,* 95 Wash. 171, 187, 163 P. 395 (1917). To enforce these maxims, our legal system developed specific rules recognized in Washington law and elsewhere and described in part in the discussion in the majority.

There are two equitable theories which I believe warrant recovery by the appellants. Although the majority correctly concludes that RCW 62A.8–201 is inapplicable, RCW 62A.8 and our history of common law estoppel point to another theory of recovery raised by implication in the briefs of appellants. That theory, recognized long ago in English courts of equity, and now embodied in Restatement (Second) of Contracts § 90 (1981), states that a promise which the promisor should reasonably expect to induce action on the part of the promisee is binding if injustice can be avoided only by enforcement. Like equitable estoppel, our courts have acknowledged that under the right facts, the doctrine may be applied against a municipality. *See State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 26, 182 P.2d 643 (1947). *See also* Annot., *Promissory Estoppel,* 48 A.L.R.2d 1069, 1086 (1956).

Promissory estoppel has four elements: a promise, foreseeability of reliance on that promise, actual reliance, and a finding that the reliance was justified. Comment, *Promissory Estoppel in Washington,* 55 Wash. L. Rev. 795 (1980). We find each element present here.

Appellants have repeatedly alleged, and respondents

cannot deny, that they made unequivocal promises to pay these debts. Section 6 of the participants' agreement states in clear, definite language that the participants would make payments under the agreement whether or not any of the projects were completed. Reliance on that promise was not only foreseeable, it was intended. In the bond resolution (approved by the participants), potential bondholders were told that the plants were being developed for the participants, and that the participants pledged their revenues as security for the bonds. Each bond resolution was approved by the participants through their committee. See BR, at 9. That there was actual reliance on the participants' promises cannot be doubted. The bondholders' collective purchase of $2.25 billion worth of bonds amply demonstrates that fact.

The final promissory estoppel prerequisite, that the reliance be justifiable, must, when viewed against the parties' course of conduct for the 5 years prior to termination, be answered in the affirmative. Until the plants were terminated, all concerned assumed that the parties had the requisite statutory authority. The bonds were freely traded and interest payments timely made. Only when the plants were actually terminated did the participants attempt to avoid their promise to the bondholders. And, only with this court's opinion in *Chemical Bank* I, was the issue of statutory authority resolved.

Under these circumstances, I believe the participants' promise must be enforced to the extent that justice requires. My conclusion rests not only on the Restatement § 90 provision but also upon the public policy embodied in RCW 62A.8-201. While I reject the notion that the participants' agreement constitutes a security, I recognize that RCW 62A.8-202 reflects a clear legislative intent that municipalities as well as individuals be held responsible for their promises and actions.

I believe the same general limitations contained in RCW 62A.8 and cases concerning equitable estoppel should be adopted in applying the doctrine of promissory estoppel. Thus, the promise must be within the promisor's general

power. *See* RCW 62A.8–201(2). Such is the case here. In this court's original majority opinion, we acknowledged the participants' general authority to enter into contracts to build nuclear power plants and to take the actions necessary to fund those plants but held that the participants had acted improperly in entering the dry hole contract. *Chemical Bank* I, at 784. Also, we recognize that the statutes contemplate general authority to act in this area. *See* RCW 35.92.050; RCW 43.52.300(1).

The majority concludes that the doctrine of unjust enrichment does not apply because the acts of the appellants were substantively ultra vires. The majority concludes that *Chemical Bank* I has already decided the issue of whether the contracts were procedurally or substantively ultra vires. I cannot agree.

When the term "substantive authority" was used in *Chemical Bank* I, it was not used in the sense of deciding whether it was procedurally or substantively ultra vires because that issue was not before us. In the past, this court has differentiated between substantive and procedural ultra vires through use of the adjectives primary and secondary. The first classification (substantive or primary) refers to acts a municipality has no authority whatsoever to perform. In the second classification fall those acts which are within the lawful powers of the municipal corporation, but which are void because of an irregularity in the procedure leading up to the act. *Jones v. Centralia,* 157 Wash. 194, 218, 289 P. 3, 11 (1930). Whether these acts were primary or secondary ultra vires should not be decided summarily and requires further discussion.

The classic application of the primary ultra vires doctrine involves the invalidation of actions that directly contravene express constitutional or statutory provisions. The doctrine's harsh results make sense upon examination of the common law basis for the doctrine. Premised on the fundamental difference between the private and public sectors, application of the doctrine exhorts a private contractor to ascertain the authority and limitations of a municipal

corporation. *See* Comment, *Chemical Bank v. Washington Public Power Supply System: An Aberration in Washington's Application of the Ultra Vires Doctrine,* 8 U. Puget Sound L. Rev. 59, 60–76 (1984).

One of the earliest cases concerning ultra vires is *Osborne, Tremper & Co. v. King Cy.,* 76 Wash. 277, 136 P. 138 (1913). In *Osborne,* the plaintiff sued King County for services performed under a contract with the river and harbor commission. A number of King County residents, operating upon the belief that the United States intended to construct the Lake Washington Ship Canal, petitioned the county commissioners for appointment of the river and harbor commission and it was thereafter appointed. The river and harbor commission then contracted with the plaintiff for preparation of an assessment roll. Payment for these services was to come from the property assessments. A few months later, the county commissioners rescinded the authority of the river and harbor commission. In the plaintiff's action to collect for services, the court denied recovery, noting the general rule that

> where there is a want of power to make a contract or a want of power on the part of the body of officers making the contract to bind the municipality, there can be no estoppel against the municipality to defeat payment by reason of accepting the benefit conferred by the contract.

*Osborne,* at 285–86. The court reasoned that the county commissioners did not have authority to create the assessment district, and therefore did not have authority to incur risks incident to the district's creation.

In *Edwards v. Renton,* 67 Wn.2d 598, 409 P.2d 153 (1965), the court confronted mixed substantive and procedural statutory violations, but approved recovery against the City of Renton. Renton had contracted with plaintiff for the installation of a traffic control signal, but failed to follow bidding procedures. The City neglected to properly budget funds for the installation. The court found that this contract represented a borrowing of funds which the City of Renton had no power to do. The court then went on to dis-

cuss the policy reasons for statutory municipal budget requirements and concluded that the contract ran afoul of these policies. Nonetheless, the court allowed a limited recovery where the contract was for a "public improvement furnished to and retained by the municipality [and where it was] within the scope of its authority to provide". *Edwards,* at 604. *Edwards* therefore moved the secondary ultra vires doctrine toward fulfilling the *reasonable* expectations of private parties contracting with public entities, consistent with the decline of the sovereign immunity doctrine. *See* RCW 4.92.090, 4.96.010.

The *Edwards* rule was further explained in *Finch v. Matthews,* 74 Wn.2d 161, 443 P.2d 833 (1968). *Finch* involved the power of King County to acquire and dispose of property in order to build roads. Although the facts are complicated, it appears that the county exchanged some worthless property for a road right of way. The City of Seattle then sought to annex the property, arguing that the County had no power to dispose of it because the property exchanged was dedicated "'to the use of the public forever'". *Finch,* at 163. The City urged a narrow interpretation of equitable estoppel against a municipality, arguing in essence that the doctrine could be valid "only when the governmental act is strictly within the recognized and established powers of government." *Finch,* at 169. The court rejected this view of equitable estoppel, holding instead that the distinction was between acts done "*wholly without legal authorization*" or in "*direct violation of existing statutes*" and "*those acts which are within the scope of the broad governmental powers conferred, granted or delegated*". (Italics mine.) *Finch,* at 172.

In *Noel v. Cole,* 98 Wn.2d 375, 655 P.2d 245 (1982), the court most recently affirmed the *Edwards* analysis. In *Noel,* the court concluded that the Department of Natural Resources had authority to sell timber, but not without preparing an environmental impact statement. However, regulations in effect required no EIS be prepared. Finding the sale a procedural violation and because both the DNR

and the purchaser had acted in good faith, the court held that recovery for the purchaser was necessary to prevent unjust enrichment. *Noel,* at 381.

I believe the instant case falls within the *Edwards–Noel* rule. The majority concluded in *Chemical Bank* I, "the Washington statutes authorize the participants to purchase power or to own electric generating facilities." *Chemical Bank* I, at 799. To that end, and to fulfill their statutory duty to develop sufficient energy sources, the participants entered into the agreements and subsequently pledged their revenues. Those acts were within their general powers as contemplated by *Noel, Finch, Edwards* and *Osborne.* Thus, as the action of the State or municipalities in entering into the agreements was only procedurally ultra vires, restitution may be obtained if a benefit was in fact given.

As to the remaining arguments of respondents, the common law doctrines which released their contractual obligations contemplate restitution if one party receives a benefit. For example, Restatement (Second) of Contracts § 272 (1981) states the remedy to be given if frustration occurs:

(1) In any case governed by the rules stated in this Chapter, either party may have a claim for relief including restitution under the rules stated in §§ 240 and 377.

(2) In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests.

Similarly, as noted in *Simonson v. Fendell,* 101 Wn.2d 88, 93, 675 P.2d 1218 (1984), mutual mistake entitles the parties to rescission and return to their original position. As a

general principle . . . rescission contemplates restoration of the parties to as near their former position as possible or practical. *J.I. Case Credit Corp. v. Stark,* 64 Wn.2d 470, 392 P.2d 215 (1964); *Yount v. Indianola Beach Estates, Inc.,* 63 Wn.2d 519, 387 P.2d 975 (1964).

Here, however, it would be impossible to return the parties to their positions prior to the contract given the lack of

statutory authority of those participants released by *Chemical Bank* I. Those participants represent approximately 70 percent of the total monetary obligation. Justice requires some sort of restitution to the bondholders. Because the public utilities and municipalities also have equitable obligations, the remaining discussion concerning remedy, benefit and equitable distribution of loss will apply equally to those released by our original decision, and those released on common law contractual grounds.

As noted above, the Restatement's definition of benefit is quite broad. Thus, the task here is to determine whether any asserted benefits fall within this definition. I conclude they do.

WPPSS asked for and received $2.25 billion in bond revenues on the request of the participants. The participants received exactly what they bargained for through their representatives on WPPSS. As noted in comment *a* to Restatement (Second) of Contracts § 370 (1981), receipt by a party of performance bargained for is regarded as a benefit. I believe the facts of this case amply demonstrate that proposition.

Further, this arrangement by which participants purchased shares of the plants' electrical output in return for their pledge of revenues satisfied the utilities' duty to develop sufficient energy resources for their ratepayers. The pertinent statutes contemplate that electrical needs of a city or public utility district will be filled. To do this, the participants must spend significant sums of money to develop alternative resources to meet future demands. Amicus on behalf of the City of Seattle observes that the City has spent $37 million for various small projects, and will spend $21 million *annually* for settlement of the High Ross Agreements. The total cost of projects now in progress is $164 million. Several of these projects have been terminated and, as a result, the City of Seattle has absorbed the entire loss. Brief of Amicus Curiae on behalf of City of Seattle, at 19. Clearly, most of the participants involved in WNP 4 and WNP 5 could not absorb similar development

costs. To the extent that the nuclear plant projects relieved the participants of their immediate costs, while allowing them to fulfill their statutory duty, they received benefits from the bondholders.

Finally, it was for the participants' benefit that the plants were being built in the first place. By entering into these agreements, pledging their revenues as security and inducing the bondholders to lend money to WPPSS, the participants anticipated that they would be able to guarantee their consumers electricity at the low rates projected for nuclear power. Without such an arrangement, each utility would have had to either develop other sources of electricity or purchase electricity at whatever would be the then current market price. The bond revenues allowed them to avoid consideration of both of these alternatives.

Moreover, I am not persuaded by respondents' theory that the benefits of the bond revenues flowed to WPPSS and no further. As discussed in detail above, WPPSS existed as a joint venture of the member utilities and the participants. Despite the majority's conclusion that the participants lacked the statutorily required ownership interest, I believe that the real interested parties to this transaction were the participants. To them, the benefits flowed and, from them, restitution is therefore proper. These factors lead me to the conclusion that justice requires some relief to the bondholders.

### Remedy

The appellants have established two theories of recovery—promissory estoppel and unjust enrichment. Restatement (Second) of Contracts § 90 (1981) states that the remedy for a breach of promissory estoppel may be limited as justice requires. Similarly, the Restatement (Second) of Restitution § 1 (Tent. Draft No. 1, 1983) provides:

> A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.

Appellants contend that principles of restitution entitle the bondholders to the entire $2.25 billion plus interest. I disagree. This figure would grant the bondholders their expectancy interest on the contracts. The majority has held that those contracts are void, however. Moreover, appellants' suggested remedy ignores the realities of the bond market. Much of the loss suffered by the bondholders is the result of panic–trading, speculation, and other forces that cannot be attributed solely to the participants' breach of promise. For instance, even before the participants disputed their legal obligation, prices quoted in the Wall Street Journal indicated the bonds were trading at levels substantially below par.

Also, appellants' argument for full restitution confuses the amount loaned WPPSS with the amount of benefit received by the participants. Just as the bondholders' investment was diluted by market forces, the participants' benefit was diluted by rising interest rates and market forces which made completion of the plants impossible.

Finally, among the people who now hold these bonds are numerous individuals who purchased their bonds after this court clearly stated that no statutory authority existed to enter the contracts. Those individuals do not come to equity with "clean hands" and I believe no equitable considerations weigh in favor of granting these individuals a windfall.

Given the complexity of this case and the posture in which it is now before this court, I am unable to discern the proper amount of recovery to the bondholders. I believe that equitable principles, however, require that we recognize the complex forces that led to the bondholders' present loss. Those principles convince me that the proper measure of restitution in this case may not exceed the value of the bonds on the day prior to our decision in *Chemical Bank* I. After that date, investors were clearly on notice that no authority existed. Prior to that date, much of the bondholders' investment was dissipated by forces unrelated to the participants' promises. Moreover, I also believe that

individuals purchasing their bonds after that date should be entitled to the purchase price of those bonds and no more. It would be inequitable to allow these individuals to profit from the losses of bona fide bondholders and the participants' ratepayers. Finally, I believe that the participants are entitled either to an offset of any value contained in the plants or to the plants themselves.

This award sets only the maximum amount of recovery I would allow under the legal theories herein discussed. The trial judge could reduce this amount by other equitable considerations and may make such provisions for payment of the judgment as are just and equitable, considering the relative positions of the bondholders and ratepayers.

For the foregoing reasons, I dissent.

DOLLIVER, J., and ALEXANDER, J. Pro Tem., concur with UTTER, J.

Reconsideration denied December 17, 1984.