956 F.2d 1497
 BONNEVILLE POWER ADMINISTRATION, Plaintiff-Appellant,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
v.
CHEMICAL BANK, Plaintiff-intervenor-Appellee.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Portland General Electric Company; Puget Sound Power and
Light Company; Pacificorp, d/b/a Pacific Power &
Light Company; Washington Water Power
Company ("WWP"),
Defendants-
Appellants.
(Two Cases)
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Snohomish County Public Utilities District No. 1,
Defendant-Appellant.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Washington Public Utilities Group, City of Tacoma, Mason
County PUD # 3, Benton County PUD, Pacific County PUD # 2,
Grays Harbor PUD, Lewis County PUD # 1, Mason County PUD #
1, Okanogan County PUD, City of Ellensburg, Skamania County
PUD, Wahkiakum County PUD, Defendants-Appellants.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
City of Richland; Chelan County Public Utility District No.
1; Douglas County Public Utility District; Grant County
Public Utility District No. 2; Clallam County Public
Utility District # 1, Defendants-Appellants.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Clark County Public Utility District No. 1, Defendant-Appellant.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Ferry County PUD No. 1; Kittitas County PUD No. 1,
Defendants-Appellants.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Benton Rural Electric Association, Defendant-Appellant.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Small Utilities Group, Defendant-Appellant.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Inland Utilities, Defendants-Appellants.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
City of Seattle, Defendant-Appellant.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Columbia Defendants, Defendants-Appellants.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Inland Power & Light Co., Defendant-Appellant.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant,
and
Clatskanie Peoples Utility District; Northern Wasco Peoples
Utility District; Tillamook Peoples Utility District;
Eugene Water & Electric Board; City of McMinnville, Oregon;
City of Forest Grove, Oregon; Springfield Utility Board;
Central Lincoln Peoples Utility District, Defendants-Appellants.
BONNEVILLE POWER ADMINISTRATION, Plaintiff,
and
Chemical Bank, Plaintiff-intervenor-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, Defendant-Appellant.
 Nos. 91-35011, 91-35013, 91-35028, 91-35029, 91-35031,
91-35032, 91-35034, 91-35036, 91-35038 to
91-35044, and 91-35401.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 8, 1991.
Decided Feb. 25, 1992.
 
 Daniel R. Murdock, James L. Stengel, Andrew M. Calamari, Deborah A. Barnhart, Donovan, Leisure, Newton & Irvine, New York City, Robert D. Stewart, Culp, Guterson & Grader, Seattle, Wash., for appellants Washington Public Power Supply System, Ferry County PUD No. 1, and Kittitas County PUD No. 1, Barbara C. Biddle, Mark B. Stern, Civil Div., U.S. Dept. of Justice, Washington, D.C., for appellant Bonneville Power Admin., Barbee B. Lyon, William F. Martson, Jr., Tonkon, Torp, Galen, Marmaduke, & Booth, Portland, Or., for appellant Portland General Elec. Co., Stephen Walters, Alan R. Merkle, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for appellant Pacific Power and Light Co., David E. Wagoner, Steven C. Marshall, Joseph E. Bringman, Perkins Coie, Seattle, Wash., for appellant Puget Sound Power and Light Co., Gary A. Dahlke, John C. Riseborough, Robert E. Neate, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Wash., for appellant Washington Water Power Co., Paul M. Murphy, Paul R. Gary, Jane A. Shapira, Heller, Ehrman, White & McAuliffe, Portland, Or., David C. Hutchison, Blair, Schaeffer, Hutchison, Vancouver, Wash., for appellant PUD No. 1 of Clark County, Washington, Albert R. Malanca, Kenneth G. Kieffer, Donald S. Cohen, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Wash., for appellant Washington Public Utilities Group, David F. Jurca, Andrew J. Kinstler, Joan L. Roth McCabe, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for appellants Columbia Defendants, Steven J. Palmer, Flynn, Merriman & Palmer, Kennewick, Wash., for appellant Franklin County PUD, Peter R. Mersereau, Rankin, Mersereau & Shannon, Portland, Or., for appellants Springfield Utility Bd., City of McMinnville, City of Forest Grove, and City of Milton-Freewater, Bart G. Irwin, Platt, Irwin, Colley, Oliver & Wood, Port Angeles, Wash., for appellant Clallam County PUD No. 1, Rockne Gill, Schwabe, Williamson & Wyatt, Portland, Or., for appellants Clatskanie PUD, Northern Wasco PUD, Tillamook PUD, and Eugene Water and Elec. Bd., Ralph K. Nickerson, Goldendale, Wash., for appellant Klickitat PUD No. 1, Gregory E. Keller, Hillis, Clark, Martin & Peterson, Seattle, Wash., for appellants Inland Utilities, Bennet A. McConaughy, Foster, Pepper & Shefelman, Seattle, Wash., for appellants City of Richland, Douglas County PUD, Grant County PUD No. 2, and Chelan County PUD No. 1, Dwight A. Halstead, Halstead & Myers, Prosser, Wash., for appellant Benton Rural Elec. Ass'n, Stephen Drummond, Richter-Wimberley, Spokane, Wash., for appellant Inland Power and Light Co., John D. Lowery, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for appellants the Small Utilities.
 Robert F. Mullen, Robert H. Baron, Cravath, Swaine & Moore, New York, New York; Carl H. Hagens, James P. Solimano, Betts, Patterson & Mines, Seattle, Wash., James C. Hansen, Olwine, Connelly, Chase, O'Donnell & Weyher, Robert B. Silver, Duke & Barrett, New York City, for appellee Chemical Bank.
 Appeal from the United States District Court for the Western District of Washington.
 Before POOLE, REINHARDT and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 Appellants Bonneville Power Administration ("BPA"), Washington Public Power Supply System ("Supply System"), Portland General Electric Company, Puget Sound Power and Light Company, Pacific Power and Light Company, Washington Water Power Company, Snohomish County Public Utilities District No. 1, Washington Public Utilities Group, City of Richland, Chelan County Public Utility District No. 1, Douglas County Public Utility District, Grant County Public Utility District No. 2, Clallam County Public Utility District No. 1, Clark County Public Utility District No. 1, Ferry County PUD No. 1, Kittitas County PUD No. 1, Benton Rural Electric Association, Small Utilities Group, Inland Utilities, City of Seattle, Columbia Defendants, Inland Power and Light Company, Clatskanie People's Utility District, Northern Wasco People's Utility District, Tillamook People's Utility District, Eugene Water and Electric Board, City of McMinnville, City of Forest Grove, Springfield Utility Board, and Central Lincoln People's Utility District appeal the district court's grant of a partial summary judgment in favor of plaintiff-intervenor-appellee Chemical Bank. The district court ruled that Supply System erroneously allocated costs between "twinned" nuclear plants using the principle of proportional cost sharing, according to which shared costs were allocated based upon the proportion of respective benefit to each plant. According to the district court, Supply System should have used an incremental cost sharing system, under which any cost that would have been incurred regardless of the second unit is charged to the first unit. We disagree and reverse and remand for entry of partial summary judgment in favor of the appellants on that issue.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 In 1975, Supply System, a joint operating agency and municipal corporation, undertook the construction of Nuclear Power Plant 1 at Hanford, Washington ("Project 1") and Nuclear Plant 3 at Satsop, Washington ("Project 3"). Projects 1 and 3 are separate utility systems with different ownership interests. Four investor-owned utilities ("IOUs") own 30% of Project 3 and are responsible for 30% of the project's costs.[1] Supply System owns 100% of Project 1 and 70% of Project 3. Supply System financed the two projects through the sale of revenue bonds. Under "net billing" agreements executed separately for each project, various regional utilities and municipalities purchased Supply System's share of the generating capability of Projects 1 and 3 and assigned that interest to BPA. BPA thus bears financial responsibility for 100% of Project 1 and 70% of Project 3.
 
 
 3
 In 1976, Supply System decided to construct Nuclear Plants 4 and 5 ("Projects 4 and 5"). Projects 4 and 5 were designed as "twins" to Projects 1 and 3. Project 4 was to be built alongside Project 1 in Hanford, and Project 5 was to be built alongside Project 3 in Satsop. Projects 4 and 5 were financed together as a single utility system. Supply System owns 100% of Project 4 and 90% of Project 5; Pacific Power and Light Company ("Pacific Power") owns 10% of Project 5. Supply System entered into Participants' Agreements with 88 regional utilities, cooperatives, and municipalities ("Participants") under which the Participants agreed to purchase a share of the generating capability of Projects 4 and 5 and in return agreed to bear a portion of the costs of the Projects. Supply System and Pacific Power executed an agreement ("Project 5 Ownership Agreement") in which Pacific Power agreed to bear a portion of the costs of Project 5. Supply System financed Projects 4 and 5 by issuing bonds pursuant to Bond Resolution 890.
 
 
 4
 The Participants' Agreements were executed on July 14, 1976. Section 14 of those agreements relates to the determination of the costs between twin projects and states that:
 
 
 5
 [c]osts solely attributable to [Plants 4/5] shall be allocated to such Plants and costs solely attributable to Nuclear Projects Nos. 1 and 3 shall not be so allocated.
 
 
 6
 Costs not solely attributable to the Plants [4/5] and attributable to both the Plants [4/5] and Nuclear Projects Nos. 1 or 3 shall be allocated to the Plants [4/5] on the basis of the proportion of respective benefit to the Plants, or if such proportion is not determinable, on the basis of an equal allocation between the Plants [4/5] and Nuclear Projects Nos. 1 and 3, respectively.
 
 
 7
 The Project 5 Ownership Agreement contained the same provision.
 
 
 8
 In the fall of 1976, Supply System developed a "Policy Statement on Equitable Cost Sharing For Twin-Unit WPPSS Projects" ("Policy Statement"). The Policy Statement provided that "each project should benefit from the economies of dual construction." The Policy Statement indicated that "incremental cost allocation" had been used up to that time. Under incremental cost allocation, "any cost that would have been incurred, regardless of the addition of the second unit, is charged to the first unit," while "any cost that is incurred because of the addition of the second unit is charged to the second unit." The Policy Statement proposed the adoption of "equitable cost allocation,"[2] under which "each project pay[s] for 'shared cost' components on the basis of the proportion of respective benefit to each project." Supply System sent the Policy Statement to BPA and the IOUs, each of which reviewed and approved it.
 
 
 9
 On December 17, 1976, Supply System adopted Resolution 1224, "A Resolution Adopting a Policy Concerning Cost Sharing at Dual Sited Projects." Resolution 1224 noted that the Participants' Agreements and the Project 5 Ownership Agreement called for the allocation of shared costs on the basis of proportion of respective benefit, or if such proportion is not determinable, on the basis of equal allocation between the respective projects. The Resolution stated that,
 
 
 10
 based on the recommendation of the Supply System staff and subject to the approval of [BPA, the Participants' Committee and the Owners' Committees] ... the equitable cost sharing principles and guidelines set forth in the position paper entitled 'Policy Statement on Equitable Cost Sharing for Twin-Unit WPPSS Projects' are accepted and approved as a reasonable and appropriate means of implementing an equitable cost sharing arrangement for dual-sited projects.
 
 
 11
 On February 23, 1977, Supply System adopted Bond Resolution 890, which authorized the issuance of bonds to finance Projects 4 and 5. The Bond Resolution broadly defines "Cost of Construction" as "all costs paid or incurred in connection with the planning, acquisition, and construction of the Projects, and the costs of Capitalized Fuel, as such costs are defined in Section 6.9 of this Resolution." § 1.1(h). Section 6.8 of Bond Resolution 890 creates a "Projects Construction Fund" to be held in trust by Supply System. Section 6.9 of Bond Resolution 890 requires that "[p]ayment of the Cost of Construction of [Projects 4 and 5] shall be made from the money in the Construction Fund." Section 6.9 states that
 
 
 12
 the Cost of Construction of the WPPSS No. 4 Project shall include all costs of constructing, acquiring, and installing said Project as generally described in Section 2.2 hereof, and the Cost of Construction of the WPPSS No. 5 Project shall include the System's Ownership Share of the "Costs of Construction" as defined in the WPPSS No. 5 Project Ownership Agreement....
 
 
 13
 Section 6.9 contains a non-exhaustive list of items included in the cost of construction, including "paying or reimbursing expenses incident and properly allocable to the acquisition and construction of each Project." § 6.9(I). The Bond Resolution provides that Projects 4 and 5 do not include any facilities constructed as a separate utility system. § 1.1(y)-(z). It also contains numerous references to the Project 5 Ownership and Participants' Agreements.
 
 
 14
 At the time that Resolution 890 was adopted letters were issued by the Construction Engineers on Projects 4 and 5. Those letters were made part of the prospectus for the bonds and stated that the projects would "benefit from the economies of dual construction and therefore share certain costs on the basis of the proportion of respective benefit."
 
 
 15
 Between 1977 and 1981, construction budgets for Projects 1, 3, 4, and 5 were developed. Supply System allocated management costs, including Architect-Engineer, Construction Manager, and Owner Administrative and General Costs, on a 50-50 basis. In 1981, Supply System decided to slow down the construction of Projects 4 and 5, and revaluated its previous method of allocating shared costs.[3] Supply System determined that during a construction slowdown it would not be equitable to continue to share common costs on an equal basis, and decided to implement incremental cost sharing beginning July 1, 1981 because that would more properly reflect the projects' proportional shares of the costs.
 
 
 16
 The Participants were unhappy with Supply System's failure to retroactively reallocate shared costs, and accused Supply System of failing to allocate shared costs in proportion to respective benefits. In order to clarify its obligations concerning the allocation of shared costs, Supply System filed this action for declaratory relief in 1982. The district court concluded that it lacked jurisdiction over Supply System's complaint, but asserted jurisdiction under 28 U.S.C. § 1345 by designating the complaint of BPA as the operative complaint. In June 1983, the Washington Supreme Court invalidated the Participants' Agreements as ultra vires. Chemical Bank v. Washington Pub. Power Supply Sys., 99 Wash.2d 772, 666 P.2d 329 (1983), aff'd on reconsideration, 102 Wash.2d 874, 691 P.2d 524 (1984), cert. denied, 471 U.S. 1075, 105 S.Ct. 2154, 85 L.Ed.2d 510 (1985). Supply System subsequently defaulted on the Project 4 and 5 bonds, while the Participants dropped their request for a reallocation of shared costs.
 
 
 17
 Chemical Bank, as trustee for Project 4 and 5 bondholders, was granted permission to intervene in this action. Chemical Bank sought a declaration of the proper basis for allocating costs between twinned Projects and sought an accounting of bond proceeds allegedly misapplied to the costs of Projects 1 and 3. In its counterclaim, cross-claim, and third-party complaint, Chemical Bank stated that Section 14 of the Participants' Agreements "spells out the principle according to which the Supply System must allocate costs attributable to Projects 4 and 5 and their twins."
 
 
 18
 In 1983, the district court stayed the proceedings in this action except claims relating to the suspension of construction at Project 3. The court lifted the stay in 1986 for the purpose of deciding motions regarding legal issues ripe for decision without further discovery. Various motions were filed either seeking to dismiss Chemical Bank's cost-sharing claims or requesting summary judgment on the issue of cost sharing. Chemical Bank's cross-motion for summary judgment sought a declaration that Bond Resolution 890 controls the use of bond proceeds, that the use of any bond proceeds to pay costs "associated with" Projects 1 and 3 violated Bond Resolution 890, that Chemical Bank has a lien on all bond proceeds wrongfully used for Projects 1 and 3, and that Chemical Bank is entitled to an accounting of the uses of all bond proceeds.
 
 
 19
 The court partially granted Chemical Bank's motion for summary judgment on May 11, 1989. The court held that Bond Resolution 890 controls the disbursement of bond proceeds, but disagreed with Chemical Bank's contention that "cost sharing" is prohibited by the Bond Resolution. The court asked for additional briefing on the proper basis for the allocation of costs between twin projects under the provisions of the Bond Resolution. The court also granted Chemical Bank a lien "on funds improperly expended as a result of costs misallocated to Projects 4/5."
 
 
 20
 The parties extensively briefed the question posed by the court, and the court heard oral argument on September 22, 1989. On October 5, 1990, the district court held that
 
 
 21
 principles of equitable cost allocation, regardless of the source utilized to define the phrase, required the application of principles akin to those espoused by Chemical Bank, and referred to in Chemical's papers under the rubric of 'incremental cost sharing.' Proper allocation of such principles--regardless of their label--would have precluded the subsidization of costs of Projects 1 and 3 by their 'twins,' Projects 4 and 5. Such principles were clearly not applied. As a result, the latter two projects apparently bore more than their fair and equitable share of construction costs.
 
 
 22
 The court ordered an accounting of all uses of Project 4 and 5 bond proceeds in order to determine the extent of the misallocation resulting from the improper use of proportional cost sharing.
 
 
 23
 On December 12, 1990, the district court stated that pursuant to 28 U.S.C. § 1292(b) the orders of May 11, 1989 and October 5, 1990 involve a controlling question of law as to which there is substantial ground for difference of opinion. This court permitted an appeal to be taken from those orders.
 
 STANDARD OF REVIEW
 
 24
 This court reviews de novo the district court's grant of summary judgment. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1989).
 
 DISCUSSION
 
 25
 A. Cost Sharing Between Twin Projects.
 
 
 26
 1. Express Provisions of Bond Resolution 890.
 
 
 27
 All of the parties agree that Bond Resolution 890 is a contract that governs the rights of Supply System and the bondholders. The parties vigorously disagree about whether Bond Resolution 890 permits proportional cost sharing or whether the resolution expressly requires incremental cost sharing.
 
 
 28
 Chemical Bank argues that sections 6.9, 1.1(y), and 1.1(z) of the Bond Resolution mandate incremental cost sharing. Section 6.9, entitled "Cost of Construction," states that "[p]ayment of the Cost of Construction of each Project shall be made from the moneys in the Construction Fund." Sections 1.1(y) and 1.1(z) contain the definitions of Projects 4 and 5, and provide that Projects 4 and 5 "shall not include any generation, transmission and distribution facilities heretofore or hereafter constructed or acquired by the System as a separate utility system." Contrary to Chemical Bank's assertion, however, these provisions do not prohibit the sharing of costs that mutually benefit both projects. While it is true that Project 4 and 5 bond proceeds can only be spent on the costs of Projects 4 and 5, Washington Pub. Power Supply Sys. v. Pittsburgh-Des Moines Corp., 876 F.2d 690, 700 (9th Cir.1989), nothing in the Bond Resolution expressly dictates that costs shared by twin projects cannot be considered costs of both projects. Rather, the Bond Resolution is silent on the question of shared costs.
 
 
 29
 While Bond Resolution 890 does not actually mention shared costs, section 14.4 of the Resolution indicates that the Resolution should be interpreted to be consistent with the Participants' Agreements and the Project 5 Ownership Agreement. It reads:
 
 
 30
 The provisions of this Resolution are not intended to create, expand, or confer any rights or obligations upon the System with respect to the construction, operation and maintenance of the Projects which are inconsistent with the provisions of the Participants' Agreements or the WPPSS No. 5 Project Ownership Agreement, but in the event of any conflict the provisions of this Resolution shall control.
 
 
 31
 The Bond Resolution does not conflict with section 14 of the Participants' Agreements and section 26 of the Project 5 Ownership Agreement which require shared costs to be allocated on the proportion of respective benefit. Therefore under section 14.4 of the Bond Resolution the proportional allocation of shared costs is permissible.
 
 
 32
 Our conclusion is buttressed by the events which led up to the adoption of Bond Resolution 890. The Participants' Agreements in July of 1976, the Project 5 Ownership Agreement in July of 1976, the Policy Statement agreed to by BPA and the IOUs in December of 1976, and Resolution 1224 which was adopted in December of 1976, all indicate that something other than incremental cost sharing was intended to be the method used in allocating costs between the projects.
 
 
 33
 Moreover, our conclusion is borne out by later events, for the proportional cost sharing method was, indeed, used without challenge during the years following the adoption of the Bond Resolution.
 
 
 34
 2. Interpreting "Cost of Construction."
 
 
 35
 If we had any doubts about our conclusion that proportional cost sharing is proper under the terms of Bond Resolution 890, those would be dispelled by reflecting upon the meaning of costs of construction of these projects. The purpose of a court in interpreting a contract is to ascertain the intent of the parties. Berg v. Hudesman, 115 Wash.2d 657, 801 P.2d 222, 226 (1990). The terms of Bond Resolution 890, which do not mention cost sharing, still indicate, at the very least, that the parties intended to agree on a reasonable cost sharing methodology. The Resolution provides that bond proceeds must be spent on the "cost of construction" of Projects 4 and 5. Bond Resolution § 6.9. Neither the appellants nor Chemical Bank asserts that "cost of construction" is itself susceptible of different meanings. See Berg v. Hudesman, 801 P.2d at 231 (dispute over meaning of term "gross rentals"). Neither party disagrees that the costs of Projects 4 and 5 consist of the costs that can properly be attributed to those projects. The real dispute, therefore, concerns a basic question: What is a reasonable allocation of costs between Projects 1 and 3 and their twins?[4]
 
 
 36
 Equity too embodies concepts of reasonableness. A basic rule of equity is "that one should not be unjustly enriched at the expense of another." Lynch v. Deaconess Medical Ctr., 113 Wash.2d 162, 776 P.2d 681 (1989). See Irwin Concrete, Inc. v. Sun Coast Properties, Inc., 33 Wash.App. 190, 653 P.2d 1331, 1334 (1982) (requiring a person to pay for a benefit if the circumstances of its receipt or retention make it unjust for him to keep the benefit without paying); Restatement of Restitution § 1 (1937). There is no unjust enrichment if one person voluntarily confers a benefit upon another. Lynch, 776 P.2d at 683. The district court evidently concluded that since Projects 1 and 3 would have had to incur the expenses in question had Projects 4 and 5 not been constructed, it would be unjust to shift any of these costs to the later projects. Yet to the extent that twinning resulted in lower total construction costs for the four projects, it is not evident that the earlier projects should receive no benefit from the twinning process. Under incremental cost sharing, for example, Projects 4 and 5 would be entitled to all of the architectural and engineering plans of Projects 1 and 3 with no obligation to compensate the earlier projects. Absent any intent by Projects 1 and 3 to give away their resources to separate utility systems, it does not seem inequitable or unreasonable to require a contribution by Projects 4 and 5 for benefits received. Indeed, it is the incremental approach which seems antithetical to one's sense of equity.
 
 
 37
 Under Washington law, extrinsic evidence "is admissible as to the entire circumstances under which a contract was made, as an aid in ascertaining the parties' intent." Berg v. Hudesman, 801 P.2d at 229.[5] Furthermore, "the reasonableness of the parties' respective interpretations may also be a factor in interpreting a written contract." Id. As we have already pointed out, extrinsic evidence shows that from the outset of Projects 4 and 5, Supply System, the Participants, the IOUs, and BPA each endorsed the allocation of shared costs according to the proportion of respective benefit. Even after the decision to terminate construction on Projects 4 and 5, the Participants did not repudiate the principle of proportional cost sharing, as Chemical Bank now does, but instead complained that Supply System had misapplied that principle. Thus, intuition and general principles bolster our conclusion that incremental cost sharing is not required.
 
 
 38
 3. Summary Judgment.
 
 
 39
 Given the posture of this case, our determination that incremental cost sharing is not required leads of necessity to a further determination that proportional cost sharing is the proper method of allocation. Thus, summary judgment to that effect should be entered. Of course, the policy of allocating shared costs between twin plants according to the proportion of respective benefit takes into account that under certain circumstances one project may derive a greater benefit from a shared expense than its twin. For this reason the return to incremental cost sharing after the decision to terminate Projects 4 and 5 can be seen as consistent with proportional cost sharing. At any rate, we express no opinion on the proper application of the proportional cost sharing principle to individual items of cost at particular times. That must await further development of the facts in the district court.
 
 
 40
 B. Unjust enrichment by the Investor-Owned Utilities.
 
 
 41
 The IOUs appeal the denial of their motion for summary judgment on Chemical Bank's claim for restitution of Project 4 and 5 bond proceeds that were allegedly misspent on Project 3. The district court held that the IOUs failed to show that no possible state of facts could support an unjust enrichment claim against them.
 
 
 42
 The IOUs maintain that they were not unjustly enriched by the alleged misallocation of bond proceeds. While recognizing that for purposes of unjust enrichment a "benefit" includes being saved from a loss, the Washington Supreme Court has twice held in actions by bondholders that "the benefits of the bond revenues flowed to WPPSS and no further." Hoffer v. State, 110 Wash.2d 415, 755 P.2d 781, 792 (1988) (citation and internal quotation omitted), aff'd on reconsideration, 113 Wash.2d 148, 776 P.2d 963 (1989); Chemical Bank v. Washington Pub. Power Supply Sys., 102 Wash.2d 874, 691 P.2d 524, 545 (1984), cert. denied, 471 U.S. 1075, 105 S.Ct. 2154, 85 L.Ed.2d 510 (1985). In both cases the court held that "WPPSS contracted with the bondholders, received their money and appropriated it for its purposes. We can see no benefit to the participants in these circumstances." Id.
 
 
 43
 The fact that the bond proceeds flowed no further than Supply System does not preclude an unjust enrichment claim against the IOUs if Supply System used bond proceeds to pay costs that were properly allocable to Project 3. As minority owners of Project 3, the IOUs' expenditures would have been reduced by any wrongful expenditure of bond proceeds on costs properly attributable to Project 3. We are aware of the fact that the IOUs never actually received bond proceeds, but bond proceeds were, at least, allegedly misspent on the asset in which the IOUs hold an interest. According to the Restatement of Restitution § 208(2), an appropriate remedy in such a case is to grant the injured party an equitable lien upon the improved property: "Where a person wrongfully uses property of another in making improvements upon property of a third person, the other can enforce an equitable lien upon the property, unless the third person is a bona fide purchaser, but he is not entitled to enforce a constructive trust." Restatement of Restitution § 208(2) (1937). See In re Anjopa Paper & Board Mfg. Co., 269 F.Supp. 241, 260 n. 22 (S.D.N.Y.1967) (when a person mistakenly makes improvements upon the property of another that person may be entitled to an equitable lien upon the property to secure his right to restitution); 5 Scott on Trusts § 514.2 (4th ed. 1989). To the extent that Supply System spent bond proceeds on costs that are properly allocable to Project 3, Chemical Bank may at least be entitled to an equitable lien on Project 3. Thus, the district court did not err in denying the IOUs' motion for summary judgment on this issue.
 
 
 44
 C. Laches and acquiescence.
 
 
 45
 The Washington Public Utilities Group appeals the district court's ruling that Chemical Bank's cost sharing claims are not barred by the doctrine of laches and acquiescence. We affirm the district court's ruling.
 
 
 46
 While we uphold Supply System's right to allocate shared costs on the basis of the proportion of respective benefit to each project, it is possible that Supply System may not have correctly allocated shared costs in all instances. In order to invoke the doctrine of laches, the Washington Public Utilities Group must demonstrate that Chemical Bank knew of facts constituting a cause of action, unreasonably delayed in bringing an action, and prejudiced the appellants because of the delay. Davidson v. State, 116 Wash.2d 13, 802 P.2d 1374, 1381 (1991). The appellants asserting the defense of laches have not demonstrated that Chemical Bank should have known that Supply System's application of proportional cost sharing may have unfairly benefitted Projects 1 and 3 in some instances. Furthermore, Chemical Bank promptly intervened in this action when it became evident that the Participants would no longer protect the interests of the bondholders. See Legal Aid Soc'y. of Alameda County v. Dunlop, 618 F.2d 48, 50 (9th Cir.1980). Finally, Supply System will not be prejudiced by having to prove that it correctly applied its own cost sharing principles.
 
 
 47
 D. Lien on Misallocated Bond Proceeds.
 
 
 48
 All appellants but BPA appeal the district court's determination that Chemical Bank was entitled to a lien on "funds improperly expended as a result of costs misallocated to Projects 4/5." While the district court acknowledged that the allegedly misallocated funds had been disbursed to contractors, suppliers, and employees, the court found that the owners of Projects 1 and 3 were the "constructive beneficiaries" of any payments made as a result of improper allocations.
 
 
 49
 "An equitable lien can be established and enforced only if there is some property which is subject to the lien." Restatement of Restitution § 161 comment e (1937). See also Spring Constr. Co., Inc. v. Harris, 562 F.2d 933, 937 (4th Cir.1977) (must have an identifiable res in order for an equitable lien to attach). In this case there is no "identifiable res" on which a lien can be imposed, because the allegedly misallocated funds have been disbursed. Therefore the court erred in granting Chemical Bank a lien on funds.
 
 
 50
 E. Supply System's Right to "Conclusively Rely" on Construction Engineer Certificates.
 
 
 51
 The Columbia Defendants argue on appeal that Chemical Bank's cost sharing claims are barred by provisions of the Bond Resolution that allow Supply System to rely upon the Construction Engineer's certification of costs. Section 6.10 of Bond Resolution 890 provides that before any payment is made from the Construction Fund, the Construction Engineer shall certify that the charge is proper and reasonable. Section 7.7 of the Bond Resolution allows the trustees appointed by the Bond Resolution to "conclusively rely" on the correctness of certificates and reports furnished to the trustee. Section 6.8 of the Bond Resolution appoints Supply System trustee of the Construction Fund. The district court ruled that Supply System is a trustee within the meaning of Bond Resolution section 7.7. The court nonetheless denied summary judgment on the ground that there was a material dispute of fact surrounding Supply System's actual reliance on Construction Engineer Certificates. The Columbia Defendants urge this court to hold that if there were Construction Engineer Certificates, Supply System was entitled to conclusively rely upon them. Summary judgment is appropriate when there is no genuine issue as to any material fact. Fed.R.Civ.Proc. 56(c). Because the questions of whether there were any Construction Engineer Certificates and whether Supply System in fact relied upon them are material questions of fact, summary judgment is inappropriate at present. Given the state of the record, a decision on the issue at this time would be little more than an advisory opinion. The district court did not err.
 
 CONCLUSION
 
 52
 When Supply System closed down these four nuclear power projects, a modern dream of plentiful power turned to ashes. This case arose when those who invested in the dream sought to salvage something from the charred remains. But in sifting the ashes the parties rendered the atmosphere about them fuliginous. That helped to obscure the major issues in this case.
 
 
 53
 However, once the sooty veil is blown away it becomes clear that what the bondholders of Projects 4 and 5 were entitled to was a reasonable allocation of costs--no more, no less. We hold that the agreement requires that the costs be allocated in proportion to the benefits derived. We reverse the district court's contrary determination.
 
 
 54
 We also hold that the bondholders are not entitled to a lien upon the now dissipated bond proceeds, and we reverse the district court's determination to the contrary.
 
 
 55
 In all other respects we affirm the judgment of the district court. The parties shall bear their own costs on appeal.
 
 
 56
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 The Investor Owned Utilities are Portland General Electric Company, Puget Sound Power and Light Company, Pacific Power and Light Company, and Washington Water Power Company
 
 
 [2]
 Actually, this is a bit of a misnomer because, to the extent not specifically indicated in the contract, the question under any kind of cost sharing is whether it is fair and equitable. Therefore, we will refer to this method as "proportional cost sharing."
 
 
 [3]
 An extended construction delay on Projects 1 and 3 is currently in effect
 
 
 [4]
 Supply System argues that it had discretion under the Bond Resolution to implement proportional cost sharing. Supply System does not indicate, however, that it had discretion to allocate costs to Projects 4 and 5 that could not reasonably be attributed to these projects, and thus the assumption that proportional cost allocation was in fact reasonable underlies its argument
 
 
 [5]
 Whether a written agreement is an integration is a different inquiry from the role of extrinsic evidence in interpreting a contract. Berg, 801 P.2d at 230. While "parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict" integrated contracts, the court still must interpret integrated agreements. Id. at 230-31 (citation and internal quotation omitted)